OCEANIC TRADING CORP., Plaintiff-Appellee,

v.

The Freights, Sub-Freights and/or Demurrage of the VESSEL DIANA, Defendant.

American Renaissance Lines, Inc., Claimant-Appellant.

No. 504, Docket 34074.

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1970.

Decided March 3, 1970.

James M. Leonard, McHugh & Leonard, New York City, for claimant-appellant.

David I. Gilchrist, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for plaintiff-appellee.

Before WATERMAN and ANDERSON, Circuit Judges, and BARTELS, District Judge.*

ANDERSON, Circuit Judge:

On March 16, 1966 Doreen Steamship Co., owner of the vessel Diana, and the appellee, Oceanic Trading Corp. (Oceanic), as charterer, entered into a time-charter of the vessel for three calendar months, the Diana to be delivered between March 21 and March 31, 1966.[1] This was a Uniform Time Charter containing the provisions adopted by The Baltic and International Maritime Conference (formerly the Baltic and White Sea Conference), as amended January 1, 1950, with the code-name "Baltime." The parties also agreed to certain additional clauses which were attached, including an option in the charterer to extend the time-charter for three months, but these have no particular bearing on the issues before the court.

Two days prior to the signing of this charter-party, Oceanic, as disponent owner, had agreed to a sub-charter of the Diana to the claimant-appellant, American Renaissance Lines (ARL), for the carriage of bagged rice from Bangkok to South Vietnam. The consignee was Ministry of Nation Economy in Saigon.

The cargo was picked up at Bangkok and claimant issued its Bill of Lading there on May 7, 1966. On arrival at South Vietnam the discharge of the cargo was delayed and demurrage became due by the Ministry of Nation Economy in the amount of $35,055.55.

It appears that this amount was sent by the consignee, by some means, to the Hong Kong branch of the Bank of America, which was instructed to forward it to First National City Bank of New York at Maspeth, Long Island, New York, to be credited to the account of Renaissance Lines. The Bank of America Hong Kong branch sent its draft for $35,055.55, which it described on the face of the instrument as funds received from the Vietnam government for "demurrage S/S Diana," to Bank of America in New York for transmittal to First National City Bank of New York at Maspeth. While the draft was in the hands of the Bank of America in New York, the demurrage fund was arrested on October 2, 1968 by process of the ad-

---

* Of the Eastern District of New York, sitting by designation.

1. This is included in the record as Exhibit 3 annexed to the affidavit of plaintiff's counsel, dated July 10, 1969.

miralty court in an *in rem* proceeding instituted by the plaintiff-appellee, Oceanic.[2] The Bank of America in New York is still holding the funds subject to further order of the court.

The Bank of America notified ARL of the arrest of the draft and counsel for ARL called counsel for Oceanic, who sent him a "courtesy" copy of the complaint. Thereafter there were a few telephone conversations between counsel for these parties but the report of each as to what was said is in conflict with the report of the other. On December 5, 1968 the court ordered that a notice to claimants for the fund be published and on December 13, 1968 such a notice was published in the New York Law Journal, advising all claimants to appear. On May 26, 1969 counsel for Oceanic requested that a default be entered against the draft. On June 5, 1969 counsel for Oceanic moved that a default judgment be entered and on the affidavit of Oceanic's counsel alone, final judgment was entered in favor of the plaintiff Oceanic against the draft in the amount of $35,055.55 for "freights, sub-freights and/or demurrage of the vessel Diana," and the Bank of America was ordered to pay the money over to the plaintiff. Neither ARL nor its counsel received any actual notice of the default, the motion for default judgment or the judgment until several days after the judgment had been entered when it

was told of these happenings by the bank. ARL then moved for an order to show cause why the default should not be vacated, the default judgment reopened and set aside, and the attachment of the funds released. A hearing was held on the motion by the district court, and it was denied. We reverse.

■ ARL appeals from the lower court ruling on the ground that the district court improperly exercised its discretion in favor of Oceanic in refusing to set aside the default, and also on the ground that the arrest of the draft in the hands of the Bank of America was void because it was outside of the reach of the *in rem* jurisdiction of admiralty. Counsel for ARL represents that after he called counsel for Oceanic and received the copy of Oceanic's fifth form of complaint, he had several telephone conferences with Oceanic's counsel concerning an effort by both parties to reconcile the accounts, reflecting a large number of dealings between their clients, including the sub-chartering of the Diana. He further asserts that he was left with the understanding that no further action in the litigation would be taken until this attempt at settlement had been made. Counsel for Oceanic concedes that after filing the new complaint he had two or three conversations with ARL's counsel but denies that there was any understanding about holding up the litigation. Ordinarily this

2. This *in rem* action, which is the present case on appeal, was Docket # 68–C–3903 in the District Court. Oceanic had previously brought an *in personam* action, Docket # 68–C–2760, the purpose of which was identical to that of the present action, i. e. to attach and recover the funds paid for demurrage on the S/S Diana. In case # 68–C–2760 Oceanic described itself as general agent for ARL, alleged there was a balance due ARL which was not within the district, but that there was a balance of accounts in favor of Oceanic, then due and unpaid. Later the complaint was amended to make a minor correction. No process, however, was issued pursuant to the complaint as filed or after the first amendment. The complaint was amended a

second time, process issued and the fund was arrested in the Bank of America in New York. Following a motion by ARL's counsel, the court vacated the attachment of the funds. Before they were released, Oceanic filed a third amended complaint, combining *in personam* and *in rem* actions, and alleged that Oceanic was disponent owner of the Diana and that the funds were sub-freights upon which Oceanic claimed a maritime lien. The attachment pursuant to this third amended complaint was vacated because of a procedural defect. Oceanic then filed a fifth pleading which is the new action, Docket # 68–C–3903, presently before us, from which process issued arresting the funds which had never left the hands of the Bank.

might not constitute good cause or excusable neglect, even if proven, but here counsel for Oceanic had already peppered ARL with four forms of complaint prior to the current action. Counsel for ARL had appeared and successfully contested them and had twice procured orders for the release of the attachment of the draft. Counsel for Oceanic argues that, having heard nothing from ARL's counsel for several months, he was justified in assuming that ARL had abandoned its claim. This argument is not very persuasive, however, because there is no logical reason why ARL, having repulsed Oceanic's first four attacks, should withdraw from the field. Oceanic's counsel knew that ARL was the principal and probably the only claimant and he had conversed with ARL's counsel; nevertheless, Oceanic gave the barest possible notice to claimants to file their claims and gave no notice whatever of the request for default and the motion for judgment. Under the circumstances of the case this was inadequate and unfair. The proceedings in admiralty and the powers of the admiralty court have long been held to be "akin to those of a court of equity." The Minnetonka, 146 F. 509, 77 C.C.A. 217 (2 Cir. 1906).

There was, it is true, fault on the part of ARL's counsel and, as the trial court noted, ARL's counsel conceded that due to the press of other matters he had lost contact with the claim, but even so, from all of the circumstances, we conclude that the claimant-appellant should not have been deprived of a hearing on the merits.

██ An additional factor which demands the reopening of the default and the setting aside of the default judgment is the fact that all of the evidentiary material, which was offered as a necessary foundation for the final judgment, consisted of statements under oath by Oceanic's counsel on information and belief or of material contained in letters which were not sworn to at all. Unless there are very unusual circumstances to justify it, the evidentiary material offered in support of a final judgment should consist of material within the personal knowledge of the affiant and not hearsay, and attached exhibits should be accompanied by sworn statements of the circumstances that would qualify them as full exhibits. Oceanic filed no affidavit of merits concerning its claim as disponent owner of the vessel Diana.

This is not to cast doubt upon the truthfulness of Oceanic's counsel, but attorneys too often swear to all manner of pleadings and representations on information and belief, when the information is of dubious accuracy and their belief of the moment is tailored to fit the exigencies of the case. The trial court in its opinion took particular note of the fact the ARL's vice-president signed the Fixture Note on its behalf, in which Oceanic was recognized as disponent owner, but that the same vice-president gave his affidavit to the court in which he swore that Oceanic was general agent for ARL in chartering the Diana. Oceanic makes a great deal of this rather glaring inconsistency on the part of an officer of ARL, but it takes a very light-hearted view of the contradiction in its counsel's sworn statement between the representation made in its second amended complaint, verified by counsel, that Oceanic was the general agent for ARL and the representation made in the complaint in the present action that Oceanic was the disponent owner of the Diana. In connection with the first complaint filed, counsel for Oceanic represented that ARL was not present in the district and there was no officer available on whom service of process could be served. But the Fixture Note describes ARL as of New York, and it appears to be uncontradicted that ARL's offices and place of business were and are in Maspeth, Queens in the City of New York. A simple inquiry would probably have avoided this mistake. These conflicting and erroneous statements demonstrate that factual representations made by counsel in pleadings and in verifications and affidavits on in-

formation and belief do not serve as a reliable foundation upon which to predicate a final judgment.

The claimant-appellant also argues that the default judgment should have been vacated because the draft in the hands of the Bank of America, representing demurrage for the Diana, was beyond the reach of the *in rem* jurisdiction of admiralty because there was no maritime lien upon the *res*. The court below found that there was such a lien and that the court had jurisdiction and based these determinations on the Fixture Note and the description therein of Oceanic as disponent owner of the Diana. But these considerations do not suffice to establish the fact that Oceanic had or has a maritime lien on the draft in the hands of the Bank of America.

Because the general maritime law does not afford a disponent owner a lien against either the cargo or subfreights when the cargo is owned by a third party, the disponent owner can acquire the security of a lien on subfreights or, as in this case, demurrage, by including in the charter-party a clause so providing and by requiring the sub-charterer to include a like clause in its Bill of Lading or to incorporate the clause in the Bill of Lading by reference to the charter-party. Gilmore & Black, Admiralty, § 9–20, p. 517, n. 103 (1957); Robinson, Admiralty, § 56, pp. 401–404, and § 88, pp. 635–636 (1939).

As the record of this case now stands it is impossible to determine whether or not Oceanic had a lien on sub-freights (including demurrage) of the Diana for the voyage in question. The Fixture Note in Clause 12 incorporates, as "other items," the clauses of a "Gencon Charterparty and/or Carrier's regular form of Bill of Lading." If by "Gencon Charterparty" the parties intended the Uniform General Charter adopted by the Council of The Baltic and White Sea Conference, as revised 1922, see Gilmore & Black, Admiralty, *supra*, Appendix B at 796, they thereby adopted its provisions regarding liens, which are in Clause #8, and which are applicable to cargoes only and not to freights. If, however, the parties used the familiar code name "Gencon" to describe the Uniform General Charter, adopted by the Baltic and International Maritime Conference (successor to the Baltic and White Sea Conference), as amended January 1, 1950 and in current use in 1966, even though it has its own code name of "Baltime," then they would have thereby adopted the lien provisions of that instrument which are in Clause #18 and include a lien on the subfreights.

If Oceanic is not given lien security under the "as per Gencon Charterparty" portion of Clause 12 of the Fixture Note, consideration must next be given to whether or not such security is afforded by the other portion of Clause 12, which says, "and/or Carrier's regular form of Bill of Lading." Here another complication presents itself. By "Carrier's" the parties apparently intended to refer to ARL's Bill of Lading. In that instrument Clause 16 provides for a lien on goods, *i. e.* cargo, only; but Clause 20 incorporates by reference "the conditions * * * contained in the Time Charter existing at the date hereof between the owners and charterers of the above named vessel." If the "Time Charter" referred to is the Fixture Note, then "the conditions" incorporated will be those to which the parties referred by using the phrase "as per Gencon Charterparty", in that agreement. If the Time Charter referred to is, however, that between Doreen Steamship Co., owner of the Diana, and Oceanic, charterer, dated March 16, 1966, then Clause 18 of that agreement, which is a Baltime Uniform Time Charter, as amended January 1, 1950, will apply.

If, however, the parties to the Fixture Note intended by the word "Carrier's" in Clause 12 to refer to Oceanic's Bill of Lading, the plaintiff will have to produce its "regular form," because there is none in the record at this time.

These many factual issues and such others as may arise call for a trial

on the merits. Even if at a trial the plaintiff Oceanic proves that, as disponent owner, it was entitled to a maritime lien on the sub-freights or demurrage, it still must prove that payment had not been made and received by ARL. This issue will call for the presentation of evidence to clarify when and how and with what understanding and instructions the consignee, the Ministry of Nation Economy of South Vietnam, sent the funds covering the demurrage due the Diana to the Bank of America at Hong Kong, and whether at any time the fund was placed in the hands of ARL or credited or posted to its account in that bank. If not, a serious question arises as to whether or not payment had actually been made. See Uniform Commerical Code, § 4–213. The leading case in which sub-freights were attached by the owner before payment to the charterer was made is United States v. Freights, etc., of the S. S. Mount Shasta, 274 U.S. 466, 467, 47 S.Ct. 666, 71 L. Ed. 1156 (1926).

Oceanic also claims that, prior to the transmittal of the funds by the consignee to the Hong Kong Bank, ARL expressly assigned the demurrage due to Oceanic and notified the Hong Kong bank to pay the money over to Oceanic, which was apparently not done. This is another factual issue which the district court will have to resolve and it is one which might be determinative of the law which will apply. See Bank of British North America v. Freights, etc. of the Hutton, 137 F. 534, 70 C.C.A. 118 (2 Cir. 1905).

Perhaps a caveat should issue with regard to statements of fact or assumptions of fact made in the course of this opinion. We have had before us a hotch-pot of incomplete evidentiary material, and references to facts are to be taken as no more than an indication of the context in which the motion to set aside the default judgment was considered, of the areas which appeared in need of clarification by further evidence, and of the factual and legal issues which will probably have to be dealt with. No

such statements or assumptions are to be taken as factual determinations; and the district court, after a trial on the merits, is completely free to make its own findings of fact and conclusions of law.

The ruling of the district court is reversed; the judgment is reopened and set aside, the default is vacated and the case is remanded to the district court for the scheduling of the filing of pleadings, pre-trial discovery and other proceedings, as the court shall direct, and for assignment for trial on the merits.