Walter B. DAVIS, Plaintiff-Appellee,

v.

Joseph H. MUSLER, Colm D. Kelly, Joseph Licata, Alexander Hill, Charles F. Wheeler, Arthur K. Paige, John Petrucci and Jacqueline Maloney, Defendants-Appellants.

No. 442, Docket 82–7412.

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1982.

Decided July 18, 1983.

Samuel I. Burstyn, Miami, Fla. (Eisenberg, Margolis & Gottfried, New York City, of counsel), for defendant-appellant Maloney.

Robert W. Cinque, New York City, for defendant-appellant Musler.

John J. Phelan, III, New York City (Phelan & Costello, New York City, of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, MESKILL and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Joseph H. Musler and Jacqueline Maloney appeal from an order of the United States District Court for the Southern District of New York, Pierre N. Leval, *Judge,* denying their motion under Fed.R.Civ.P. 55(c) and 60(b) to vacate a default judgment which was entered against them in the amount of $516,222.91. The judgment purportedly consisted of $256,573.50 in "actual liquidation damages", $100,000 in punitive damages, and $100,000 in attorneys' fees, plus interest and costs. Because defendants' motion raised substantial questions of law and fact which could not possibly be resolved on the papers that were submitted to the district court, we conclude that denial of the motion without a hearing was an abuse of discretion. Accordingly, we vacate the order and remand for further proceedings.

## BACKGROUND

The origins of the present controversy can be traced back at least as far as December 1977, when Walter Davis commenced a lawsuit ("the first action") in the Southern District of New York against Joseph Musler and two corporations, Multiple Access, Inc. (MAI) and Itel Corp. (Itel). The gist of Davis's complaint, which embodied fourteen causes of action, was that defendants had schemed to wrongfully deprive him of a 10% ownership interest in MAI, as well as certain salaries and commissions. Musler, MAI's chief executive officer, allegedly masterminded this scheme. Itel was implicated because it had purchased all of MAI's stock shortly after Davis was ousted from that company. In his complaint, Davis demanded compensatory and punitive damages.

This first action went to trial before a jury in the Southern District in August 1979, and resulted in a verdict against all three defendants in the sum of $257,573.50. After this verdict was returned, Judge Sofaer granted Itel a new trial, but judgment was entered against Musler and MAI on December 6, 1979. Following a second trial, in which Itel prevailed, an appeal and a cross-appeal were taken to this court. In April 1981, the judgments against Musler and MAI, and in favor of Itel, were affirmed in all respects.

Davis initiated the instant action in January 1981, while the appeal and the cross-appeal in the first action were still pending. He named as defendants Musler, his wife Maloney, and six others who did not default and are not parties on this appeal. In his complaint Davis identified these defendants collectively as former employees, sharehold-

ers, officers and/or directors of MAI. He then briefly described the nature and status of the first action, emphasizing that the judgments he had obtained had not been satisfied in any part, despite the fact that execution had not been stayed. Against this backdrop, he set forth eight causes of action, all stemming from either the underlying activities which precipitated the first action or the manner in which that action had been defended. Among other things, Davis alleged that (1) the activities of all defendants, both before and after the trials, amounted to a conversion of his interest in MAI or Itel, a prima facie tort, and an interference with his prospective business advantage; (2) all defendants with the exception of Maloney were effectively bound by the judgments in the first action since (a) they had agreed to indemnify Itel for the "costs" of that action and (b) Davis was a third-party beneficiary of those agreements; (3) all defendants had entered into a "civil conspiracy" to assist in the defense of the first action; and (4) defendants Musler and Maloney had conspired to evade the judgment against Musler in the first action by sheltering their assets and moving their residence to Florida. The complaint sought $257,573.50 in actual damages—the precise sum of the award in the first action. It also sought $1,000,000 in punitive damages and $100,000 in attorneys' fees.

After commencing his second action, Davis was temporarily unable to locate Musler and Maloney. Consequently, his original attempt to serve them with the summons and complaint in February 1981, at what he believed to be their New York address, was unavailing. Likewise, his continuing efforts to collect the judgment in the first action were also unsuccessful. Davis did, however, eventually manage to track down Musler and Maloney in Florida several months later. Thereupon, he initiated supplementary enforcement proceedings to collect the first judgment under Fed.R.Civ.P. 69 and arranged to have Musler and Maloney served with deposition notices and subpoenas in the Florida proceedings and the summons and complaint in the second action simultaneously.

To accomplish this, he engaged the services of one Nicholas Vassalotti, a licensed Florida private investigator. According to Vassalotti's affidavit of service, which was filed with the court below on August 11, 1981, Vassalotti arrived at the Musler-Maloney residence in West Palm Beach on June 3, 1981, and was greeted at the front door by a woman who roughly fit Maloney's description. Surprisingly, this woman denied ever having heard of "Jacqueline" or "Jacqueline Musler". After briefly consulting with a man who was working on the front lawn, who confirmed that "This is the Musler residence", Vassalotti returned to the door and knocked again. This time he was met by a man who claimed to be "Joe Marshall", but who produced a business card bearing the name "C. Paul Bellamy". Having seen enough, Vassalotti asserted that the man at the door was Joseph H. Musler and advised him that he had subpoenas and deposition notices as well as summonses and complaints for him and Jacqueline Maloney. When the man refused to accept service, Vassalotti informed him that he was leaving the papers on the railing at the front door.

After over three months elapsed without either Musler or Maloney filing an answer, Davis returned to the Southern District and initiated default proceedings. As a preliminary step, he obtained a certificate from the clerk of the court, dated September 16, 1981, noting defendants' default. He then submitted that certificate to Judge Leval, together with a copy of the judgment in the first action, an itemized statement of the amounts allegedly due in the second action, a proposed default judgment, and an affidavit in support thereof, sworn to by his attorney, John J. Phelan, III. In this affidavit, which was also dated September 16, 1981, Phelan outlined the causes of action alleged in the second complaint and claimed damages in "the liquidated amount" of $457,573.50. He further explained that $256,573.50 of this sum represented "actual liquidation damages", based on the judgment in the first action; $100,000 represented attorneys' fees, "based upon the time expended by plaintiff's counsel in recovering this judgment"; and $100,000 repre-

sented punitive damages, which were "calculated by reference to the amount of attorneys' fees and loss of use of money in excess of legal interest." Phelan offered no explanation of why this last component of the damages demanded had been reduced from the $1,000,000 originally sought in the second complaint.

Beyond the routine representations that neither Musler nor Maloney was an infant, an incompetent, or in the military, Phelan further asserted that the previously filed affidavit of service, sworn to by Vassalotti, established that "copies of the summons and complaint were personally served on the defendants Joseph H. Musler and Jacqueline Maloney on June 3, 1981." Finally, Phelan noted that the time within which to respond to the complaint had long since expired.

The district judge signed the default judgment on September 22, 1981. He apparently saw no need to first resort to Fed.R.Civ.P. 55(b)(2), which provides in part that "if, in order to enable the court to enter [a default] judgment * * * it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper". Judgment was formally entered on September 28, 1981.

Meanwhile, at the same time that the default judgment was being processed in the Southern District, Davis's supplementary proceedings in the first action were being actively contested in Florida. On September 24, 1981, Musler voluntarily appeared for a deposition in the Florida proceedings, pursuant to an agreement between Phelan and Musler's local counsel, Samuel I. Burstyn. At this deposition, Phelan presented Burstyn with a copy of the complaint in the second action. Burstyn then sent to Judge Leval a letter dated September 28, 1981, the body of which is reproduced below in its entirety:

The undersigned represents Mr. and Mrs. Joseph Musler, two of the defendants in the referenced suit. In the course of my general representation of them, I received a copy of the instant complaint from John Phelan, Esquire, on Thursday, September 24, 1981. This copy was delivered to me in connection with a matter not directly pertaining to the instant litigation.

After discussions with Mr. and Mrs. Musler, I am convinced that they were not ever personally served with this complaint. They further advised me that the claims advanced are devoid of merit. It is their intention, if no default has yet been entered, to deny the claims of the Plaintiff. Further, in the event that any default activity has occurred, they desire to vacate any Orders relating thereto on personal jurisdictional grounds, as well as on the basis of defective service.

I am currently endeavoring to engage the services of counsel in New York on behalf of Mr. and Mrs. Musler.

Would you be so kind as to have your secretary advise the undersigned of the status of this matter?

Obviously, Judge Leval could not have considered this letter prior to the entry of the default judgment. As is discussed more fully below, the record is unclear as to whether he or his staff ever responded to it, and as to whether the letter was considered in connection with the ensuing motion to vacate the judgment.

On January 7, 1982, over three months after the default judgment was entered and Burstyn wrote to Judge Leval, Musler and Maloney, now represented by New York counsel, formally filed their motion to vacate under Fed.R.Civ.P. 55(c) and 60(b). The specific grounds for relief asserted were first, that the judgment had occurred as a result of "mistake, inadvertence, surprise, or excusable neglect", Fed.R.Civ.P. 60(b)(1); second, that the judgment was void for lack of personal jurisdiction, Fed.R. Civ.P. 60(b)(4); and third, that defendants had meritorious defenses to the action, namely, res judicata as to Musler and failure to state a claim upon which relief could be granted as to Maloney.

In support of their motion, defendants submitted, among other things, an affidavit

sworn to by Musler, in which he offered the following version of the events leading to the default:

2. That sometime after June 3, 1981, I did receive various documents that were left at my home apparently by a process server.

3. That the documents appeared to be documents relating to a judgment obtained against me by one WALTER B. DAVIS, JR. in a New York lawsuit.

4. That I assumed that these documents related to an upcoming deposition of me in connection with that existing judgment.

5. That I had no reason to believe that Mr. DAVIS was suing me again as I have subsequently discovered he did especially because the subject matter of the second lawsuit appeared to be the same as that in the first.

6. That I did not even advise JACQUELINE MALONEY about these papers.

7. That I have since discovered that these papers may have contained a notice of a new lawsuit against JACQUELINE MALONEY.

8. That I did not discover that possibility until sometime in September, 1981.

Davis's attorney responded to the motion to vacate with an answering affidavit in which he disputed defendants' claim that they were not validly served under Fed.R. Civ.P. 4(d)(1) and asserted that res judicata was inapplicable. To support this second point, he emphasized that the instant action embraced "a number of additional causes of action announcing new theories why the funds are due from both Musler and Maloney", which arose "at least in part, only after entry of the prior Judgment". Nevertheless, he conceded that "should Musler satisfy the first Judgment, in whole or in part, Plaintiff would be required to give credit in the second action for any such payment."

Judge Leval denied defendants' motion to vacate the judgment in a one-paragraph order dated April 27, 1982, again without conducting any form of hearing. His entire discussion of the claims raised on the motion consisted of the following two sentences:

Defendants claim mistake, inadvertence, or excusable neglect, Fed.R.Civ.P. 60(b)(1), in that Musler did not realize that the papers left at his home concerned a new action, and thus he never informed Maloney, his wife, of the service. Defendants have failed to make out a valid claim of excusable neglect.

The order did not acknowledge that defendants had also sought relief under Fed.R. Civ.P. 60(b)(4), or that they had alleged the existence of meritorious defenses.

The record does not reflect precisely what materials Judge Leval considered in deciding the motion to vacate. We assume that he had before him defendants' package of motion papers and exhibits, Phelan's affidavit in opposition to the motion, together with exhibits, and an affidavit and memorandum of law in opposition to the motion submitted on behalf of Joseph Licata, one of the non-defaulting defendants. All of these documents were properly docketed and filed in the district court. During the few months that the motion to vacate was pending, however, the parties supplemented their original submissions by sending materials that were generated in the ongoing Florida proceedings directly to Judge Leval. These materials, which were never formally docketed and filed, included hearing transcripts and excerpts from the depositions of Musler and Vassalotti. Similarly, on May 18, 1982, several weeks after Judge Leval issued his order denying defendants' motion, and the same day that the instant notice of appeal was filed, counsel for Musler and Maloney forwarded a copy of an order of the district court in Florida, dated May 11, 1982, quashing the deposition notices and subpoenas that had supposedly been personally served on Musler and Maloney there in June 1981 on the grounds of improper service. At the same time, counsel requested reconsideration of the order which is the subject of this appeal. Counsel for Davis responded on May 24, 1982. None of these documents was filed with the clerk and there is no indication in the record of any action having been taken on the request for reconsideration.

**912**

We are aware of these various unfiled documents, as well as the September 28, 1981 letter sent by Burstyn to Judge Leval, referred to earlier, only because on August 31, 1982, with Judge Leval unavailable, Judge Werker granted defendants' motion to supplement the record on appeal by including them. While, as we have already indicated, the record does not reveal whether and, if so, to what extent Judge Leval considered any of these materials, we see no reason why they should not now be considered part of the record on appeal. We have therefore considered them for what they are worth in light of the surrounding circumstances.

On appeal, Musler and Maloney renew their arguments that (1) the district court lacked *in personam* jurisdiction over them because they were never properly served under Fed.R.Civ.P. 4(d)(1); (2) they were entitled to relief under the "mistake, inadvertence, surprise, or excusable neglect" standard of Fed.R.Civ.P. 60(b)(1); and (3) the second action was barred by the doctrine of res judicata and also failed to state a claim upon which relief could be granted against Maloney under Fed.R.Civ.P. 12(b)(6). In addition, they contend that (4) they were entitled to three days' written notice prior to the entry of the default judgment since their attorney had "appeared" within the meaning of Fed.R.Civ.P. 55(b)(2); and (5) the district judge erred in not holding a hearing to determine the proper measure of damages, since none of the three components of the judgment which was entered could fairly be characterized as "liquidated damages". While none of these arguments is conclusive, for the reasons below we conclude that further proceedings are required before this litigation can be justly terminated.

## DISCUSSION

At the outset, we must emphasize that this is an appeal from the denial of a motion to vacate a default judgment, which "brings up only the denial of the motion and not the [merits of the underlying] judgment itself." *United States v. Cirami*, 535 F.2d 736, 741 (2d Cir.1976), *quoting Wagner v. United States*, 316 F.2d 871, 872 (2d

Cir.1963). Hence, the seemingly formidable arguments that defendants were entitled to both three days' notice and that punitive damages and attorneys' fees should always require a hearing prior to the entry of judgment, which were not the subject of a direct appeal nor raised in defendants' motion to vacate, are not properly before us now. *United States v. $22,640 in United States Currency*, 615 F.2d 356, 359 (5th Cir. 1980). Instead, our scope of review is limited to determining whether the district judge abused his discretion in declining to grant relief on the grounds that were asserted in defendants' motion. *See Nederlandsche Handel-Maatschappij, N.V. v. Jay Emm, Inc.*, 301 F.2d 114, 115 (2d Cir.1962).

A motion to vacate a default judgment is, in the first instance, addressed to the sound discretion of the district judge. *United States v. Erdoss*, 440 F.2d 1221, 1223 (2d Cir.1971), *cert. denied*, 404 U.S. 849, 92 S.Ct. 83, 30 L.Ed.2d 88 (1972); *Standard Newspapers, Inc. v. King*, 375 F.2d 115, 116 (2d Cir.1967); *Nederlandsche Handel-Maatschappij, N.V. v. Jay Emm, Inc., supra; Bourgeois v. El Paso Natural Gas Co.*, 257 F.2d 807, 808 (2d Cir.1958); *Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir.1957); *cf. United States v. Cirami, supra* at 739. Default judgments implicate sharply conflicting policies, *see* 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure: Civil*, § 2693 at 477–93 (1983), and the trial judge, who is usually "the person most familiar with the circumstances of the case and is in the best position to evaluate the good faith and credibility of the parties", *id.* at 475, is entrusted with the task of balancing these competing considerations. A reviewing court will defer to the decision below unless it is "clearly wrong". *Id.* at 474.

Unfortunately, the present case does not fit comfortably within this framework. To begin with, the default occurred at the pre-answer stage of the litigation, *cf. Flaks v. Koegel*, 504 F.2d 702, 709–11 (2d Cir.1974); *Gill v. Stolow, supra*, and all of the proceedings below were determined solely on papers. Thus, it is unlikely that Judge Leval, who played no role in the first action, had

more than marginal familiarity with the parties in this case.

Second, as we have already indicated, it was unclear which papers were before the district judge when he made his decision.

Third and most important, the order appealed from does not reveal the standards that the district judge applied in denying the motion, or the factors that he considered determinative. Indeed, the order does not even mention several of the arguments pressed by defendants. Further, unlike *Standard Newspapers, Inc. v. King, supra,* where the district judge failed to assign a written reason for denial of a motion to vacate a default judgment but it was readily apparent from the record on appeal "both that the court had studied the matter and why it denied the motion", 375 F.2d at 116, the record here does not indicate what, if anything, the district judge had in mind when he denied defendants' motion. We are thus left guessing as to the grounds underlying the decision below.

Given that an abuse of discretion "need not be glaring" to justify reversal of a district court order denying a motion to vacate a default judgment, *Keegel v. Key West & Caribbean Trading Co., Inc.,* 627 F.2d 372, 374 (D.C.Cir.1980); *see also Jackson v. Beech,* 636 F.2d 831, 835 (D.C.Cir. 1980); *Bridoux v. Eastern Airlines, Inc.,* 214 F.2d 207, 210 (D.C.Cir.), *cert. denied,* 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954), the practice followed by the district judge here, which this court disapproved in *Standard Newspapers, Inc. v. King, supra,* arguably warrants a reversal on appeal in and of itself. *See Keegel v. Key West & Caribbean Trading Co., Inc., supra* at 374. But even if it does not, there are additional reasons why we cannot defer to the decision below. Only a cursory analysis of the claims defendants presented below and preserved on appeal is necessary to demonstrate that their motion raised related questions of law and fact, questions which could not be resolved, other than arbitrarily, on the papers that were submitted to the district court. Under these circumstances, the denial of the motion without a hearing to supplement and clarify the record constituted an abuse of discretion.

Defendants first claim they are entitled to relief under Fed.R.Civ.P. 60(b)(4) on the ground that the judgment was void for want of personal jurisdiction. The crux of their argument is that they were never properly served under Fed.R.Civ.P. 4(d)(1). Specifically, they contend that when viewed in light of the affidavit submitted by Musler in the instant action, the affidavits submitted by Musler and Maloney in the Florida proceedings, the hearings and deposition excerpts from the Florida proceedings, and the decision of the Florida district court quashing the deposition notices and subpoenas that were served simultaneously with the summons and complaint in the instant action, the Vassalotti affidavit is itself insufficient to establish compliance with Rule 4(d)(1).

Plaintiff responds to this argument in several ways. First, he contends that the Florida decision has no impact here, since it was handed down several weeks after Judge Leval rendered his decision and, more importantly, was based on Fed.R. Civ.P. 45 which imposes stricter standards than Rule 4(d)(1), inasmuch as it permits only personal rather than either personal or substituted service. Second, plaintiff contends that the affidavits submitted by Musler here and by Musler and Maloney in Florida are more notable for what they do not say than for what they do say and that, in any event, even when considered together with the Florida hearing and deposition excerpts, they do not substantially contradict the assertions contained in the Vassalotti affidavit. Thus, in plaintiff's view, it is clear from the record that Rule 4(d)(1) has been satisfied.

Having defined the issue in this way, the parties have managed to obscure one fairly important facet of this case: Rule 4(d)(1) does not apply. When read in light of Rule 4(f), it is clear that Rule 4(d)(1) applies only when a complaint is served within the territorial limits of the state in which the district court where the action is pending sits. *See Zarcone v. Condie,* 62 F.R.D. 563, 566 (S.D.N.Y.1974). Yet

that is not what happened here, since the action was initiated in federal district court in New York, and service was effectuated, if at all, in Florida. Under these circumstances, Rule 4(e), which is reinforced by Rule 4(f), requires that service be made "under the circumstances and in the manner prescribed" by the law of the state in which the forum court is located. Thus, New York law, not Rule 4(d)(1), controls the service issue in this case.

It is arguable that since defendants have failed to couch their "personal jurisdictional" argument in terms of New York law, both here and below, they have effectively waived any challenge to service of process in this case. However, since the relevant provisions of the New York Civil Practice Law and Rules (CPLR), §§ 313 and 308(1) (McKinney 1972 & Supp.1983), are substantially similar to Rule 4(d)(1), at least with respect to purely personal service, and since plaintiff has not pressed the point, we are unwilling to rest our resolution of this issue on such technical grounds.

At the same time, we do not consider whether service of process on Musler or Maloney could be challenged—or sustained by reason of waiver—under New York's substituted service provision, CPLR § 308(2), which differs significantly from the corresponding provision in Fed.R.Civ.P. 4(d)(1) insofar as it imposes the additional requirement that the summons be mailed to the defendant at his last known residence. Similarly, we do not consider whether either or both Musler or Maloney could successfully challenge service under the second paragraph of CPLR § 308(5), which imposes special service requirements for default proceedings. None of these arguments is before us on this appeal.

With respect to personal service, however, we believe that defendants' motion raised sufficiently serious questions of fact to warrant an evidentiary hearing under New York law. Standing alone, the weasel-worded affidavit submitted by Musler in the instant action might not be sufficient to support defendants' position. But we cannot overlook that both defendants did assert in identical unequivocal language in affidavits submitted in the supplementary proceedings "That on June 3, 1981, I was not at home all day, as I was out on personal errands, shopping, etc." Further, the order of the Florida district court quashing the deposition notices and subpoenas is some evidence, albeit inconclusive, to suggest that defendants were never personally served. In our view, these circumstances necessitate an evidentiary hearing. *Weinberg v. Hillbrae Builders, Inc.,* 58 A.D.2d 546, 396 N.Y.S.2d 9, 10–11 (1st Dept.1977); *Nuez v. Diaz,* 101 Misc.2d 399, 406, 421 N.Y.S.2d 770, 775 (Sup.Ct. Monroe Cty. 1979); *see Balduan v. Contey,* 220 A.D. 336–39, 221 N.Y.S. 482–85 (1st Dept.1927).

We recognize that New York courts have traditionally and wisely had little tolerance for the type of gamesmanship that plaintiff claims took place here. It is thus well-settled under New York law that where a defendant refuses to accept service, the papers may be left in his general vicinity. *McDonald v. Ames Supply Co.,* 22 N.Y.2d 111, 115–16, 291 N.Y.S.2d 328, 331–32, 238 N.E.2d 726, 729–30 (1968), and cases cited therein; *see also Conforti v. Beekman Downtown Hospital,* 79 A.D.2d 968, 435 N.Y.S.2d 284 (1st Dept.1981). But a process server who adopts that course of action must bring "the questioned process within the purview of the person to be served", *Haak v. Town of Wheatland,* 86 A.D.2d 961, 962, 448 N.Y.S.2d 305, 307 (4th Dept.1982), *quoting McDonald v. Ames Supply Co.,* supra at 115–16, 291 N.Y.S.2d 328, 238 N.E.2d 726, since "[t]he defendant must be made aware that he or she is in fact being served with process". *Id.* Thus, even if we were to accept the Vassalotti affidavit at face value, we could not necessarily conclude that Maloney had been properly served. *Cf. Buscher v. Ehrich,* 12 A.D.2d 887, 209 N.Y.S.2d 941 (4th Dept.1961) (personal service on wife upheld where she sat in plain sight and hearing while husband was handed summonses for both at door of their home, after she refused to come to door and server was denied admittance).

For these reasons, a hearing must be held before it can be determined whether the motion to vacate should be granted on the ground of defective service.

The same result follows, but for different reasons, with respect to defendants' argument that they are entitled to relief under Rule 60(b)(1). In essence, they contend that the default judgment was the product of a mixture of "mistake", "surprise", "inadvertence", *and* "excusable neglect". Given that all doubts should be resolved in favor of those seeking relief under Rules 55(c) and 60(b), *e.g., Medunic v. Lederer,* 533 F.2d 891, 893–94 (3d Cir.1976); *Tolson v. Hodge,* 411 F.2d 123, 130 (4th Cir.1969); *Bridoux v. Eastern Airlines, Inc., supra* at 210; *cf. Radack v. Norwegian America Line Agency, Inc.,* 318 F.2d 538, 539, 542 (2d Cir.1963), we believe defendants should be given a chance to prove it.

In applying Rule 60(b)(1) in the context of default judgments, courts have gone beyond the bare wording of the rule and established certain criteria which should be considered in deciding whether the designated standards have been satisfied. These criteria, which are conspicuously absent from the decision below, include (1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted. *See, e.g., Jackson v. Beech, supra* at 836; *Medunic v. Lederer, supra* at 893; *Tolson v. Hodge, supra* at 130; *cf. Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981) (applying these criteria in reviewing a motion to set aside the entry of a default under the more lenient "good cause shown" standard of Rule 55(c)).

Under the first criterion, the record is unclear as to whether the failure of defendants to respond to the complaint in the second action was willful. Defendants concede "that sometime after June 3, 1981" Musler received a copy of the summons and complaint. However, they claim that Musler mistakenly assumed that these papers related to the supplementary proceedings that were ongoing at the time, and did not realize "until sometime in September, 1981" that he, as well as his wife, had been named as defendants in a second lawsuit. On the surface, this explanation is plausible, since the summons and complaint in the second action were delivered to Musler's residence simultaneously with the deposition notices in the supplementary proceedings.

We are aware of only one case in which an analogous argument was advanced in support of a motion to set aside a default judgment. *McVicker v. Donnelly,* 95 F.R.D. 353 (E.D.Pa.1982). The court there held: "This confusion resulting from the time proximity and subject matter similarity of the two proceedings clearly demonstrate that defendant's failure to respond constitutes 'excusable neglect.'" *Id.* at 355.

The fact that Musler vigorously contested the supplementary proceedings, with the assistance of counsel, but did not respond to the second complaint, which sought similar relief, lends some credence to defendants' explanation. However, as plaintiff argues, it also cuts the other way. Plaintiff submits that it is improbable that once Musler "discovered" the documents that had been left at his residence, he would not have immediately turned them all over to Burstyn, who was representing him in the Florida proceedings and presumably was capable of distinguishing a deposition notice from a complaint. Since Burstyn did apparently receive copies of the deposition notices, plaintiff would have us conclude that Musler and Maloney deliberately declined to respond to the second complaint.

The problem with plaintiff's argument is that the record does not reflect whether, and if so when, Musler delivered any of the papers in question to Burstyn. In the letter he sent to Judge Leval dated September 28, 1981, Burstyn only stated that "in the course of my general representation of [Musler and Maloney], I received a copy of the instant complaint from John Phelan, Esquire on Thursday, September 24, 1981. This copy was delivered to me in connection with a matter not directly pertaining to the instant litigation." The implication of this statement seems to be that it was not until this "matter not directly pertaining to the instant litigation", which just happened to be Musler's deposition in the supplementary proceedings, that Burstyn first received a copy of the second complaint. While the literal language of the letter is consistent with Burstyn having also received the complaint at some earlier juncture, until this

matter is clarified, the willfulness issue cannot be resolved.

■ With respect to the second criterion, the existence of a meritorious defense, the record is somewhat clearer, but several questions remain unanswered. We agree with defendants that the instant action seems to be nothing more than a transparent attempt to repackage the claims asserted in the first action and thereby obtain a joint judgment against Musler and Maloney, which would obviously be more favorable from an enforcement standpoint, in addition to a sizeable award of attorneys' fees. Yet it does not necessarily follow that the instant action is barred by res judicata. While it is true, as defendants emphasize, that (1) the claims asserted in each action stem from the same core of facts, (2) the principal sum sought in each action is identical, and (3) plaintiff's attorney concedes that plaintiff would be required to credit any funds collected from Musler as a result of the supplementary proceedings in the first action against the judgment in the instant action, it is also true, as plaintiff points out, that several of the "causes of action" in the second complaint alleged facts which occurred after judgment was entered in the original action. However, since a defendant seeking to vacate a default judgment need not conclusively establish the validity of the defense(s) asserted, *Keegel v. Key West & Caribbean Trading Co., Inc., supra* at 374; *Trueblood v. Grayson Shops,* 32 F.R.D. 190, 196 (E.D.Va.1963), we believe defendants have made a sufficient showing at this juncture to justify further briefing and consideration by the district judge.

We also note that as far as Maloney is concerned, the motion papers submitted to the district judge were sufficient to raise a serious question as to whether the second complaint stated a claim upon which any relief could be granted. While defendants did not in the district court specifically pinpoint the weaknesses in each of the claims pressed against Maloney, as they have done in their briefs on appeal, they did emphasize, first, that Maloney was implicated only because she was Musler's wife, and second, that the "civil conspiracy" claim could not

be maintained since Davis had prevailed in the first action. In our view, this was enough to alert the district judge to the inadequacy of at least several of the counts in Davis's second complaint and was deserving of some reasoned response from the district judge.

■ Turning to the third criterion, plaintiff does not contend that he would be substantially prejudiced if the judgment were vacated, and we see no basis upon which he could. Concededly, some delay will result if defendants' motion is granted. Yet, delay alone is not a sufficient basis for establishing prejudice. *Feliciano v. Reliant Tooling Co., Ltd.,* 691 F.2d 653, 656–57 (3d Cir.1982); *Gill v. Stolow, supra* at 672. Rather, it must be shown that delay will "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." C. Wright, A. Miller and M. Kane, *supra,* § 2699 at 536–37. No such claim has been made here.

Furthermore, granting defendants' motion would not prevent plaintiff from continuing his attempts to enforce the first judgment. Given plaintiff's position that the same sum is at stake in both actions, it is hard to see how he could be substantially prejudiced.

## CONCLUSION

■ This court has never hesitated to reverse the denial of a motion to vacate a default judgment where further factfinding was necessary to ensure that substantial justice was served. *E.g., Flaks v. Koegel, supra; Oceanic Trading Corp. v. Vessel Diana,* 423 F.2d 1 (2d Cir.1970); *Radack v. Norwegian American Line Agency, Inc., supra; see Gill v. Stolow, supra; cf. United States v. Karahalis,* 205 F.2d 331 (2d Cir. 1953). This case falls squarely within our prior holdings. "[T]he extreme sanction of a default judgment must remain a weapon of last, rather than first, resort", *Meehan v. Snow, supra* at 277, which should only be imposed "upon a serious showing of willful default." *Gill v. Stolow, supra* at 670. While we do not condone the manner in which defendants have conducted themselves throughout these proceedings, the de-

cision below is manifestly unjust and cannot be allowed to stand. In short, the district judge here abused his discretion by failing to exercise it.

The order is therefore vacated, and the case is remanded to the district court for proceedings consistent with this opinion.

VAN GRAAFEILAND, Circuit Judge, concurring:

As Judge Pratt quite properly has observed, this Court ordinarily does not consider arguments that were not presented first to the district court. However, "[o]rderly rules of procedure do not require sacrifice of the *rules of fundamental justice.*" *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Where "the proper resolution is beyond any doubt," or where "injustice might otherwise result," we may consider issues not passed on below. *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *see La Bruna v. U.S. Marshal,* 665 F.2d 439, 442 (2d Cir.1981); *Adato v. Kagan,* 599 F.2d 1111, 1116 (2d Cir.1979). "Indeed, if deemed necessary to reach the correct result, an appellate court may *sua sponte* consider points not presented to the district court and not even raised on appeal by any party." *Washington Gas Light Co. v. Virginia Electric and Power Co.,* 438 F.2d 248, 251 (4th Cir.1971). I believe the district court committed such plain error in entering a default judgment without a prior hearing on appellee's claims for unliquidated damages that this Court would be remiss if it did not say so. *See Klapprott v. United States,* 335 U.S. 601, 611–12, 69 S.Ct. 384, 388–89, 93 L.Ed. 266 (1949) (Opinion of Black, J.); *Davis v. National Mortgage Corp.,* 320 F.2d 90, 91–92 (2d Cir.1963).

The judgment includes awards of $100,-000 for attorneys' fees, $100,000 as punitive damages, and $257,573.50 in compensatory damages, the latter figure being the amount of a judgment already obtained against appellant Musler. The only support for the award of attorneys' fees was the following statement by appellee's attorney in his affidavit accompanying the motion for judgment by default:

A copy of the prior judgment is annexed as Exhibit "A". The attorneys' fees are calculated based upon the time extended by plaintiff's counsel in recovering this judgment.

How the figure of $100,000 for attorneys' fees was arrived at is as obscure as the legal basis for appellee's right to recover such fees. Under the circumstances, an award for legal fees should not have been made. *Davis v. National Mortgage Corp., supra,* 320 F.2d at 91–92.

The punitive damage award finds its sole support in the following statement of appellee's attorney:

Of the $1,000,000 punitive damages claimed, plaintiff now requests judgment by default in the sum of $100,000, an amount calculated by reference to the amount of attorneys' fees and loss of use of money in excess of legal interest.

The award of $100,000 in punitive damages also was without adequate factual support. *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974).

Damages in the amount of $257,573.50 were awarded against appellant Maloney on the theory that a prior judgment against appellant Musler had reduced the amount of damages to a liquidated figure. Appellee contends that, since Maloney is charged, among numerous other torts, with interfering with appellee's right to pursue and collect his judgment, the amount of the judgment is "the exact and readily computable amount by which he has been damaged." Appellee's Brief at 36. This is specious reasoning. Appellee has made no showing that, if Maloney had not "interfered", appellee would have collected from Musler all, or any readily calculable part, of the judgment against him. *See Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 69–70 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

If the compensatory damage award against appellant Musler was for a liquidated amount, it was only because appellee already had secured a judgment for that amount against Musler. It is not clear from appellee's complaint whether he is suing Musler on the prior judgment or wheth-

er he is suing for a second time on the original claim. If it is the latter, appellee has no cause of action. "Once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises." *Kotsopoulos v. Asturia Shipping Co.,* 467 F.2d 91, 95 (2d Cir.1972). If it is the former, suit on the judgment is a useless act, giving appellee no greater security than he already had and imposing an unnecessary burden on an already overburdened court. Vexatious and repetitious suits on judgments should not be encouraged. For either of the foregoing reasons, appellee's second judgment on the $257,-573.50 claim should be vacated.

Because the judgment of the district court did not rest upon a reliable foundation, it must be vacated. *See Oceanic Trading Corp. v. Vessel Diana,* 423 F.2d 1, 4–6 (2d Cir.1970); Fed.R.Civ.P. 60(b)(6). However, even though the judgment is vacated, if service on appellants was effected, they will still be in default in answering. If the district court, following the hearing which we now direct, decides that appellants were not served, that will end the matter. If the district court decides that appellants were served, it must then decide whether to open the default. In so doing, the district court should be guided by the liberal standards of Fed.R.Civ.P. 55(c) rather than the more rigorous ones of Rule 60(b). *Meehan v. Snow,* 652 F.2d 274, 276–77 (2d Cir.1981); *Jackson v. Beech,* 636 F.2d 831, 835–38 (D.C.Cir. 1980).