BANK OF BRITISH NORTH AMERICA v. FREIGHTS, ETC., OF THE HUTTON.

SAME v. FREIGHTS, ETC., OF THE ANSGAR.

(Circuit Court of Appeals, Second Circuit. April 12, 1905.)

Nos. 653, 654.

1. SHIPPING—FREIGHTS—PLEDGE—MARITIME LIEN.
Where a charterer procured advances from a bank on the credit of the freights of particular vessels, assigning the charters and insurance policies covering the freights, etc., the bank had a maritime lien on such freights, which it was entitled to follow into whosesoever hands they might go.

2. SAME—TERMINATION OF LIEN.
Where a charterer had been in the habit of procuring advances from a bank on the credit of the freight of particular vessels, and had collected such freights as agent for the bank, deposited them to his individual bank account, and thereafter applied only the balance in excess of the advances to his own use, the bank's maritime lien on such freight did not terminate on the charterer's depositing and mingling the same with his own funds.

3. SAME—ENFORCEMENT—REMEDIES.
Where a bank had a maritime lien on the freights of certain vessels for advances, it was entitled to enforce the same by an action in admiralty in rem, regardless of the fact that it also had a lien enforceable in equity.

4. SAME—TRUST FUND—APPROPRIATION BY AGENT—DEPOSITS—APPLICATION—PAYMENT OF CHECK.
Where a charterer collected freight as the agent of a bank which held a maritime lien thereon, and deposited such freight to his individual bank account, but, before accounting for such advances, depleted the account by a check drawn against it for other purposes—not, however, shown to have been delivered until after he deposited $2,500 of his own money to the credit of the account—such deposit should be applied to the payment of the check pro tanto in exoneration of the trust deposit.

Appeals from the District Court of the United States for the Southern District of New York.

For opinion below, see 127 Fed. 859.

Charles S. Haight, for appellants.

Mark W. Patten, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

WALLACE, Circuit Judge. These are actions in rem by which the libelant seeks to assert an alleged lien arising out of the following facts: For two or three years prior to 1901 the libelant, a foreign bank having representatives in New York City, had been accustomed to make advances to one Perry, who was engaged there in operating chartered vessels. He usually had a number of vessels under charter, carrying cargoes upon long voyages, and his profits depended upon the excess of the freights earned by them, and payable upon delivery of the cargo at the port of destination, beyond disbursements for hire and other expenses; and, at times when he required moneys to pay hire and other disbursements of a vessel, he was accustomed to apply to the libelant, and the libelant would advance them to him. These advances were made without taking any evidence of indebtedness from him, and with the understanding that they were made against, and should be repaid from, the freights of the particular vessel for which they were made; and, as security, Perry customarily assigned to the libelant the charters and insurance policies covering the freights for the particular voyages. Upon the arrival of the vessels, Perry would collect the freight, deposit the amount to his own credit in bank, mingling the amount with his own funds, and would pay the libelant by checks drawn upon that bank. Among the vessels chartered by Perry were the steamers Ansgar and Hutton. December 26, 1900, he applied to the libelant for advances against the freights of these vessels. His letter, after stating that the former was about to load at Calcutta on her voyage home, with her hire paid to December 27, 1900, and that the Hutton was about to load at Nagasaki on her voyage home, with her hire paid to January 3, 1901, reads: "We desire advances against freights above steamers, $10,000 each. Kindly hand us your check for $20,000 and oblige. Documents will be handed you later." The libelant thereupon advanced him $20,000, which he deposited in his bank account; making a note on the stub of his checkbook that $10,000 was advanced "against freights" of the Ansgar, and $10,000 "against freights" of the Hutton. January 23, 1901, he sent the libelant the documents relating to the Ansgar, and February 2, 1901, the documents relating to the Hutton; these consisting of the charter parties, memoranda of accruing freights, and insurance policies covering the freights for the particular voyages; the charter parties and insurance having his assignment indorsed thereon. The memoranda showed expected freights of about $65,000. January 30, 1901, he applied for an additional $10,000 against the freights of the Ansgar, and on February 15, 1901, he applied for $20,000 more—$10,000 against the freights of each vessel. These sums were advanced by the libelant—in all $30,000 against the freights of the Ansgar,

and $20,000 against the freights of the Hutton. The Ansgar arrived at New York April 10, 1901, and 'the Hutton April 26, 1901. Perry collected the freights, and of the amount he deposited about $39,000 to the credit of his account in the Bank of New York. Perry died May 8, 1901, at which time there was a balance to his credit in that bank derived to the extent of $18,000 from the freights of the Hutton, and $803.78 from the freights of the Ansgar. His estate proved to be insolvent.

The libelant asserts that there was an hypothecation of the freight moneys, and that it is entitled to follow them into Perry's bank account. The claimant, the administrator of Perry's estate, asserts that the libelant stands in no better position than do the other creditors of Perry in respect to the moneys in bank.

Quite irrespective of the fact, which may be put aside for present purposes, that Perry used nearly $20,000 of the advances of the two vessels in aid of the voyages upon which the freights were earned, the libelant acquired a maritime lien upon the freights by the agreement of hypothecation, and thereby became the equitable owner. A pledge for loans made for the purpose of directly aiding the prosecution of current voyages, and upon the faith of the freights to be earned, as a part of the contract, is as purely maritime as a bottomry bond. The Advance, 72 Fed. 797, 19 C. C. 'A. 194. Indeed, it has been held by the Supreme Court of New York (Brown v. Gray, 70 Hun, 261, 24 N. Y. Supp. 61) that an action to restrain the diversion of freight moneys which had been pledged for advances, and which it was asserted the charterers were collecting and misapplying, could not be maintained in the state court, because it involved an adjudication as to the existence of a maritime lien, and was therefore within the exclusive jurisdiction of the federal courts in maritime causes. The lien created by a maritime pledge of freights follows the freights through all their transmutations, and wherever they can be found. It is familiar doctrine of the admiralty courts that a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it, and that the lienholder may follow the proceeds wherever he can distinctly trace them. "Wherever there is a maritime lien upon property, it adheres to the proceeds of that property, into whose hands soever they may go, and these proceeds may be attached in the admiralty." Benedict, Adm. Pract. § 290 (3d Ed.), where the authorities are collected in the note.

It is contended for the appellant that the lien in this case ceased when Perry collected the freights and deposited them in bank. This argument can be valid only if the parties by their agreement contemplated that the lien should then cease, or if, by reason of what subsequently occurred, the libelant waived the lien. The lien, being the creature of the contract, ceased to exist only when the contract contemplated it should be at an end. The parties were at liberty to agree that the freight in solido should be set apart for the satisfaction of the advances, or that either should collect the proceeds, or that Perry should do so, and deposit them

in his own bank, and apply so much of them as was necessary to satisfy the advances.

If we could only ascertain the intention of the parties from the proposition in the letter requesting the advances in controversy, and the acceptance implied by making the advances, the terms of the hypothecation in controversy would be so indefinite as to leave much open to discussion; but the particular hypothecation was made pursuant to the previous course of business between the parties, and its meaning is to be ascertained by their understanding in the previous similar hypothecations. The previous hypothecations contemplated, as the assignment of the charter in each instance shows, that the libelant should be at liberty to intervene and appropriate the freights, and forestall Perry's collection of them, for the purpose of realizing its advances, if at any time it might find it desirable to do so; but they as obviously contemplated that Perry should ordinarily collect the freights, deposit them in bank in his own name, apply such part of them as were in excess of the advances to his own use, and apply the balance to the payment of the advances, acting as agent for the libelant in collecting the freights and retaining such of the proceeds as belonged to the libelant. Indeed, the proofs show that it was expressly understood between them that when he collected the freights he should act as the agent for the libelant. Such an understanding is wholly inconsistent with the presumed intent of the parties that the lien should not exist in the instances in which Perry should be permitted to collect the freights. We think the hypothecation imported that the lien should survive so long as the advances should be unpaid, whether the freights were unpaid by the consignees and remained in their hands, whether they were in Perry's hands in the form in which they had been paid, or whether they were in his custody in the form of proceeds deposited in his bank account. In the Freights of the Kate (D. C.) 63 Fed. 707, the subject of hypothecation of freights for advances was exhaustively discussed by Judge Brown, and in that case he decided, in view of the terms of the hypothecation, and the extrinsic facts connected with the transaction, that the lien was intended to be a general one, extending to all freights earned by the vessels of the borrower, including those chartered subsequently to the loans. He said:

"They plainly intended both a specific and a general lien on all the profits of the company's line; and, if that was the intent, effect must be given to it, so far as it was lawful, and not incompatible with the rights of others."

So, here, if the parties intended that the lien should extend to the proceeds from freights deposited in bank by Perry in his own name, effect should be given to that intention.

If it appeared by the proofs that during the period of the advances Perry had been using the libelant's part of the freights for his own purposes, with the knowledge of the libelant, there would be substantial ground for holding that there had been a waiver of the lien. A principal who customarily permits his funds to be mixed by his agent with the agent's own funds, and used by the agent as his

own, occupies no better position with respect to the common fund than does any other creditor of that agent, and may well be deemed to have waived any equitable lien upon it arising from the misappropriation of the fiduciary. It does appear that the libelant was aware that Perry was depositing the proceeds in his general bank account, and that he was drawing checks against the account for other purposes than paying the advances; but, so far as appears, the libelant had no reason to suppose that these checks were not drawn against Perry's own part of the fund.

Concluding, as we do, without any hesitation, that the libelant's lien extended to the deposits in Perry's bank account, we think it clear that the libelant was entitled to assert its lien upon those proceeds in a court of admiralty to the extent to which they could be traced, and by an action in rem. The action being one to enforce a maritime hypothecation, jurisdiction is complete. Cutler v. Rae, 7 How. 731, 12 L. Ed. 890; Sheppard v. Taylor, 5 Pet. 675, 8 L. Ed. 269; American Steel Barge Co. v. Chesapeake & Ohio Coal Agency Co., 115 Fed. 669, 53 C. C. A. 301; The Kalorama, 10 Wall. 210, 19 L. Ed. 941; The Mary, 1 Paine, 671, Fed. Cas. No. 9,187. And it is quite immaterial that, superadded to the lien and the remedy in admiralty, the libelant may also have had an equitable lien, and a remedy in a court of equity to reach the proceeds in the bank account of Perry as its fiduciary.

It is insisted for the appellant that the libelant has recovered $2,500 more than the amount of the hypothecated freights which have been traced as remaining in his bank account. It appears that on May 6, 1901, Perry drew a check which depleted the freight moneys remaining in his account in the sum of $3,479. This check was not paid by the bank or charged to his account until May 8, 1901. Before it was paid, and on May 7th, he deposited $2,500 of his own moneys. This is the sum which it is argued was improperly allowed to the libelant. The court below gave its reasons for the allowance as follows:

"If the $3,479 transaction had not taken place, the fund would have been that much larger for the benefit of the libelant. Having taken place, however, to the detriment of the libelant, and $2,500 having been subsequently deposited on the same account, it would seem that equity would appropriate the money to repay the loss to the extent it would go, and in this view the $2,500 should be applied on the payment of May 6th, leaving the original account unimpaired by that transaction."

If it had appeared that Perry had delivered this check previously to depositing the $2,500, we should be of the opinion that the amount ought not to have been allowed, but that fact does not appear. The rule in equity is that if a person holding money in a fiduciary capacity intermingled in his account at his bankers with his own money, draws checks upon his account generally, he is to be regarded as having drawn out his own in preference to the trust money; and the ordinary rule attributing the first payment to the first credit does not apply in such a case. Pinkett v. Wright, 2 Hare, 12; Ellicott v. Kuhl, 60 N. J. Eq. 333, 46 Atl. 945; Importers' Bank v. Peters, 123 N. Y. 272, 25 N. E. 319. It is not to be assumed

that Perry intended to misappropriate the part of the account represented by the libelant's moneys, and, upon the analogy of the equitable rule mentioned, it is to be presumed that, to the extent that the account represented his own moneys when he delivered the check, it was drawn against that part of the account. We are satisfied the amount was properly allowed.

The decrees are affirmed, with costs.