## TAIWAN INTERNATIONAL LINE LIMITED, Plaintiff,

v.

## MATTHEW SHIP CHARTERING LTD., MONTREAL, Defendant.

No. 82 Civ. 2782(MP).

United States District Court,
S. D. New York.

Sept. 9, 1982.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for plaintiff by Vincent J. Barra, and John A. Ciraldo, New York City.

Hill, Betts & Nash, New York City, for intervenor Royal Bank of Canada by David I. Gilchrist, New York City, and Pierre Cote, Quebec, Canada.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for garnishee Associated Metals & Minerals Corp. by Brian M. Murphy, and Thomas D. Toy, New York City.

OPINION

MILTON POLLACK, District Judge.

This is a suit by Taiwan International Line, Ltd. ("Taiwan Line"), the owner of the M/V GLORIOUS TRADER, to recover $203,692.47 in freights and demurrage from Matthew Ship Chartering, Ltd. ("Matthew Chartering"), which hired the vessel in September 1981. The Royal Bank of Canada ("the Bank") has intervened to claim the same funds on the basis of a general assignment of receivables granted to it seven years previously by Matthew Chartering in 1974.

Taiwan Line has moved for summary judgment in its favor pursuant to Fed. R. Civ. P. 56, while the Bank has cross-moved for an order directing payment of the funds to it. For the following reasons, the Court holds that Taiwan Line is entitled to the freights and demurrage earned by the ship, irrespective of the general assignment to the Bank.

*Facts*

On August 5, 1981, Matthew Chartering entered into a charter party with Associated Metals & Minerals Corp. ("Associated") to ship 40,000 metric tons of di-ammonium phosphate from Florida to India. Under the agreement, Matthew Chartering had the option of using two or three ships, to be named later, for the carriage of the cargo. The contract also provided that within five working days of signing and releasing the bills of lading, 90% of the agreed charge for freight was due and payable to Matthew Chartering.

On September 9, 1981, in arranging its performance of the August 5 contract with Associated, Matthew Chartering hired the M/V GLORIOUS TRADER from Taiwan Line, the vessel's owner. The charter party between Matthew Chartering and Taiwan Line provided for freight charges in an amount less than Matthew charged Associated and that 90% of the freight earned by the ship was due and payable to Taiwan within seven days of the signing and releasing of the bill of lading. The agreement also provided that the "[b]alance of freight

is payable by [Matthew Chartering] upon vessel's completion of discharge and receipt by [Matthew Chartering] of Owner's final freight invoice." Clause 13 of the charter party specifically provided that: "The Shipowners shall have a lien upon the cargo for all freight, dead freight, demurrage, average, and all other charges whatsoever."

By September 19, 1981, the M/V GLORIOUS TRADER completed loading her cargo of 14,098.499 metric tons of di-ammonium phosphate at Tampa, Florida, at which time the bill of lading was signed and released. In accordance with their respective contracts, Associated paid Matthew Chartering $601,917.80 on October 1, 1981 and Matthew Chartering paid Taiwan Line $518,955.54 on October 7, 1981, these amounts constituting the 90% of the charges agreed to be due and payable to each respectively at that time for the freight.

On November 2, 1981 the M/V GLORIOUS TRADER arrived at Madras, India, and began unloading her cargo, finishing on November 28, 1981, at which time the vessel proceeded to her second discharge port, Calcutta.

More than seven years earlier, on September 20, 1974, Matthew Chartering had granted a general assignment [1] of its receivables then or in the future to become due to the Royal Bank of Canada. The assignment was registered in Montreal on September 26, 1974. On November 25, 1981, after the M/V GLORIOUS TRADER had begun discharging her cargo in Madras, the Bank sent a notice of assignment to Associated that the latter's "account in the amount of $121,948.17 due to Matthew Ship Chartering Ltd. has been assigned to this bank as collateral security. Full payment of this account shall be directed to our office." The Bank made no claim for the 90% of the freight, amounting to $601,917.80, which Associated had paid under its charter party with Matthew Chartering on October 1, 1981; similarly, after that sum

was deposited in Matthew's account with the Bank, Matthew paid out through that Bank account the amount thereof payable to Taiwan, $518,955.54 on October 7, 1981, as mentioned above, without any objection or claim to any part thereof by the Bank.

On December 1, 1981, the M/V GLORIOUS TRADER arrived at Calcutta, where she completed unloading her cargo on December 20, 1981.

On January 8, 1982, Matthew Chartering sent an invoice to Associated for $246,624.07, consisting of the 10% balance of the freight and the demurrage due Matthew Chartering under its charter party with Associated on account of the M/V GLORIOUS TRADER's voyage. On January 22, 1982, Taiwan Line sent an invoice to Matthew Chartering for $203,692.47, consisting of the 10% balance of the freight and the demurrage earned by the ship and due Taiwan Line under its charter party with Matthew Chartering.

On April 29, 1982, the Bank sent a second notice of assignment to Associated this time demanding payment pursuant to its 1974 assignment of $246,624.07, the full balance of the freight and demurrage due from Associated to Matthew Chartering. Again, the Bank made no claim to the 90% of the freight that had previously been paid over, or to an additional $24,391.91 that Associated had paid Matthew Chartering sometime during the interim.

At no time prior to the commencement of this action did Taiwan know of nor did the Bank attempt to notify Taiwan Line that over seven years earlier it had been granted a general assignment of Matthew Chartering's receivables, or specifically, that it claimed a right to the moneys deliverable to Matthew Chartering by Associated or to the freight and demurrage included therein earned by the ship as a result of the M/V GLORIOUS TRADER's voyage.

---

1. The general assignment provided that Matthew Chartering "hereby grants, assigns, transfers and makes over unto the ROYAL BANK OF CANADA ... all book accounts and book debts and generally all accounts, debts, dues and demands of every nature and kind howsoever arising or secured and now due, owing or accruing or growing due, or which may hereafter become due, owing or accruing or growing due" to Matthew Chartering.

On April 30, 1982, Taiwan Line commenced the present action against Matthew to recover the balance of freight and demurrage that it has demanded from Matthew Chartering. Associated, with the consent of the Bank and Matthew, placed $246,624.07, the entire amount it admittedly owes to Matthew Chartering on account of the M/V GLORIOUS TRADER's voyage, in escrow pending the outcome of this suit.

None of the parties dispute that the invoiced amounts are presently due and owing. The only issue in this case is whether the Bank, by reason of the assignment to it in 1974, is entitled to the $203,692.47 that Matthew Chartering owes to Taiwan Line on the 1981 carriage of goods despite the fact that neither the Bank nor Matthew gave Taiwan Line notice of it. The conclusion this Court reaches is that the Bank does not have a superior right to the money earned by the ship for freight and demurrage that is due Taiwan and may have only the surplus freights above that indebtedness which has been placed in escrow.

*Discussion*

■ Under the terms of the 1974 assignment, the Bank is entitled only to those accounts and debts which become owing to Matthew Chartering. In this case, however, so much of Associated's obligation to Matthew as was payable for Taiwan's charges for freight and demurrage owed by reason of the voyage of the M/V GLORIOUS TRADER were debts owed and payable to the shipowner, Taiwan Line, and not to Matthew Chartering—those amounts were earnings made by the ship, not its charterer. Therefore, the Bank's general assignment did not attach to the freight and demurrage at issue in this case, viz., the ship's hire—which are part of the escrow established by Associated.

■ "As a general rule, the right to the freight is incidental to the ownership of a vessel, and the owner is the one who has the right to the earnings made by the ship." *Layne & Bowler Corp. v. United States Shipping Board Emergency Fleet Corp.,* 27

F.2d 39, 41 (9th Cir. 1928). Thus, "as voyage charterer," all Matthew Chartering "could assign was surplus freights earned, if any, after full payment of the vessel's hire." *N.H. Shipping Corp. v. Freights of the S/S Jackie Hause,* 181 F.Supp. 165, 170 (S.D.N.Y. 1960).

The same principle applies with equal force to the demurrage owed, since demurrage is hire or earnings of the ship as payment for the use of the ship beyond the charter term, or "extended freight." *The Saturnus,* 250 F. 407 (2d Cir.), *cert. denied,* 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918).

■ Even if the Bank's general assignment were effective to reach the freight and demurrage at issue here, that assignment would in no event prevail over Taiwan Line's maritime lien on the portion of the funds escrowed by Associated covering the amount of the ship's hire.

■ It is well settled that a shipowner under a voyage charter has a lien on the charterer's cargo for freight, *The Bird of Paradise,* 72 U.S. (5 Wall.) 545, 554, 18 L.Ed. 662 (1866), and for demurrage, *Davis v. Smokeless Fuel Co.,* 196 F. 753, 755 (2d Cir.), *cert. denied* 229 U.S. 617, 33 S.Ct. 777, 57 L.Ed. 1353 (1912).

Clause 13 of the charter party between Taiwan Line and Matthew Chartering explicitly provided that: "The Shipowners shall have a lien upon the cargo for all freight, dead freight, demurrage, average, and all other charges whatsoever." [2] Such a maritime lien prevails over all non-maritime claimants, *The Lottawanna,* 87 U.S. (20 Wall.) 201, 221, 22 L.Ed. 259 (1873); G. Robinson, *Robinson on Admiralty* § 60 (1939), and all maritime claimants [such as the Bank here] whose liens arose earlier in time, *Robinson* § 61.

■ The Bank—not disputing this maritime principle—nevertheless argues that Taiwan Line's maritime lien for freight and demurrage does not attach in

---

**2.** The bill of lading stated that it was "subject to all terms, conditions & exceptions as per governing charter party and any addenda thereto."

superiority to the Bank, presumably, because it was extinguished by Taiwan's release of the cargo. Taiwan did release the cargo but under circumstances in which the shipowner's lien on the cargo for freight is transferred to the funds payable for the freight [in this case the amount due from Associated]. *United States v. Freights of S.S. Mount Shasta,* 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156 (1927); *Atlantic Richfield Co. v. Good Hope Refineries, Inc.,* 604 F.2d 865, 872 (5th Cir. 1979); *Beverly Hills National Bank & Trust Co. v. Compania De Navegacione Almirante S.A. Panama,* 437 F.2d 301, 304 (9th Cir.), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971); *Tarstar Shipping Co. v. Century Shipline, Ltd.,* 451 F.Supp. 317, 327–28 (S.D. N.Y. 1978), *aff'd,* 597 F.2d 837 (2d Cir. 1979); *N.H. Shipping Co. v. Freights of the S/S Jackie Hause,* 181 F.Supp. 165, 171 (S.D.N.Y. 1960). Of course, it is the general rule that when the shipowner has notice of adverse rights before the cargo has been discharged, he must retain the cargo or condition its release on the substitution of the freights therefor in order to extend his lien to the freights. *Good Hope Refineries,* 604 F.2d at 872–73; *Beverly Hills Bank,* 437 F.2d at 304.

In this case, however, as we have already seen, Taiwan Line never had any notice that another party had a claim to the freights due to Taiwan from Matthew Chartering. Indeed, the Bank neither attempted to inform Taiwan Line of the general assignment granted it by Matthew Chartering or of its intent to enforce its rights thereunder; indeed its release of funds through the Matthew account to Taiwan, mentioned above, was inconsistent with any notion of a superior claim thereto.

The charter party specifically provided, in Clause 53, that freight would not be payable until the cargo was discharged. It is therefore apparent that Taiwan Line and Matthew Chartering contemplated that, under ordinary circumstances, the cargo would be unloaded and released as soon as the ship arrived in port. Having no reason to believe that payment of the freight would not be forthcoming from Matthew Chartering,

Taiwan Line had no basis on which to detain the cargo or condition its release.

Taiwan Line cannot be held to have lost its lien on the freights and demurrage simply because it released the cargo in accordance with the charter party when it had no notice of other adverse claims. More importantly, the Bank may not take advantage of Taiwan Line's release of the cargo to enforce its own claim to the money earned by Matthew Chartering as a result of the M/V GLORIOUS TRADER's voyage, since the Bank's own silence and release to Taiwan of more than 90% of the freights and demurrage earned by the ship prevented Taiwan Line from otherwise preserving its rights.

*Conclusion*

Taiwan Line is entitled out of the escrowed fund to $203,692.47, which is the 10% balance of freight and demurrage earned by the ship from the voyage of the M/V GLORIOUS TRADER from Tampa, Florida to Calcutta, India in the fall of 1981. The Bank's general assignment of debts from Matthew Chartering never attached to that portion of the funds escrowed and, in any event, Taiwan Line has a superior maritime lien on those funds which prevails over the Bank's interest in them, if any. The undisputed surplus represented by balance of the escrow is by consent of Matthew payable to the Bank.

Accordingly, Taiwan Line's motion for summary judgment is granted, and the intervenor Bank's cross motion is denied except to the extent of the surplus freights, and it is

ORDERED that $203,692.47 currently held in escrow by the parties, be paid over to Taiwan International Line, Ltd. and the surplus of the escrow remaining thereafter be paid to the Bank.

SO ORDERED.