CORNISH SHIPPING LTD.,
Plaintiff–Appellant,

Pohang Iron & Steel Co., Ltd.,
Intervenor–Plaintiff–
Appellant,

v.

INTERNATIONAL NEDERLANDEN
BANK N.V., f/k/a NMB Postbank Groep,
N.V., Garnishee–Defendant–Appellee.

No. 1126, Docket 94–7786.

United States Court of Appeals,
Second Circuit.

Argued Jan. 18, 1995.

Decided April 20, 1995.

Peter J. Gutowski, New York City (Michael Fernandez, Freehill, Hogan & Mahar; and Bryan Cave, and Steven R. Haffner, on the brief), for plaintiff-appellant and intervenor-plaintiff-appellant.

John M. Toriello, New York City (James H. Hohenstein, Haight, Gardner, Poor & Havens; and Peter E. Calamari, and Anthony L. Paccione, Hertzog, Calamari & Gleason, on the brief), for garnishee-defendant-appellee.

Before: NEWMAN, Chief Judge, MINER and CABRANES, Circuit Judges.

JON O. NEWMAN, Chief Judge.

This appeal in an admiralty case presents a novel question concerning the scope of a shipowner's maritime lien on subfreights. At issue is whether the lien attaches to funds that were paid to a charterer after the owner gave notice of the lien to the payor. The question arises on an appeal by plaintiff Cornish Shipping Ltd. ("Cornish") and plaintiff-intervenor Pohang Iron & Steel Co., Ltd. ("POSCO") from the April 20, 1994, judgment of the District Court for the Southern District of New York (Kimba M. Wood, Judge), which granted the summary judg-

ment motion of garnishee-defendant International Nederlanden Bank, N.V. ("INB") in an action to recover funds paid to INB in its capacity as agent and assignee of a charterer of a ship owned by Cornish. Because we conclude that a shipowner's lien on sub-freights does not attach to funds that have been paid to the charterer or its agent, we affirm.

## Background

*Parties and contractual provisions.* This case arose out of an ill-starred voyage of the cargo vessel M/V *Filoktitis* from United States Gulf ports to Korea. In the Fall of 1991, defendant Ferromet Resources, Inc. ("Ferromet") contracted to sell and deliver American steel scrap to plaintiff-intervenor POSCO, C.I.F. Korea. POSCO was to pay Ferromet for the scrap, its transport, and insurance under a letter of credit issued on POSCO's behalf by Shinhan Bank ("Shinhan"). Ferromet could draw down the Shinhan letter of credit upon presentation of specified documents, including bills of lading and original invoices for the scrap. The sales invoice submitted by Ferromet to POSCO indicated that approximately $1.6 million of the total price for the steel scrap was attributable to the cost of transport ("freight value").

On its end, Ferromet received financing for this transaction from defendant-garnishee INB, with which it had an established credit relationship. INB advanced $3.3 million to cover the acquisition of the steel scrap and the cost of charter hire. As part of this financing transaction, Ferromet assigned to INB all moneys to become due under its October 10 contract with POSCO and further agreed that INB could apply moneys that it received from POSCO to the repayment of any of Ferromet's outstanding obligations to INB. A financing statement covering this assignment was filed in Florida at the end of 1991. This security arrangement supplemented security interests that INB had previously acquired in Ferromet's property, including its current and future accounts receivable.

To transport the shipment of steel scrap to Korea, Ferromet time-chartered the cargo vessel M/V *Filoktitis* from its owner, plaintiff Cornish. Under the terms of the charter party, Ferromet agreed to pay freight to Cornish at the rate of $13,750 per day, and Cornish reserved a lien on all subfreights earned by the *Filoktitis* for amounts due under the charter.[1] In addition to the steel scrap, Ferromet planned to use the *Filoktitis* to transport a cargo of stainless steel, which it was selling to POSCO under a separate contract and separate financing arrangements.

*Voyage of the* Filoktitis. In January 1992, the cargoes of stainless steel and steel scrap were loaded onto the *Filoktitis* at United States Gulf ports, and bills of lading were issued to Ferromet. By the end of the month, Ferromet had delivered to INB the documents required to draw down the Shinhan letter of credit in payment for the scrap shipment. Acting as Ferromet's collecting bank, INB notified Shinhan on February 3 of certain discrepancies in these documents, which would have to be waived by POSCO before the letter of credit could be drawn down.

These discussions between INB and Shinhan were immediately overtaken by events triggered by the impending insolvency of Ferromet. On February 3, the same day that INB began discussions with Shinhan, Cornish notified POSCO that Ferromet had defaulted on its payment of freight and that Cornish was exercising its lien on any subfreights due from POSCO to Ferromet. Cornish's notice of lien also informed POSCO that the *Filoktitis* had been detained in Panama because Ferromet had not paid Canal dues and because another creditor of Ferromet had attached the bunkers of the *Filoktitis* to secure payment of hire for another ship, the M/V *Grigoroussa*. The next day, Cornish filed in the District Court a com-

---

**1.** "Freight" is the hire paid by the charterer to the owner for the use of the latter's vessel. *See* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–11, at 194 (2d ed. 1994). "Sub-freights" are amounts that third-party payors— whether subcharterers, shippers, or consignees— contract to pay directly to the charterer for the hire of the ship or the transport of goods. *See* 2 *id.* § 11–17, at 207 n. 25.

plaint against Ferromet, initiating the present action. Pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, which governs *in rem* actions for the enforcement of maritime liens, the District Court issued warrants for the arrest of the subfreights of the *Filoktitis*. These warrants were served on five banks in New York, including INB, on February 4, and again on February 13 and February 21.

As a result of the ensuing negotiations between all parties to the escalating controversy, INB eventually agreed to place $250,000 in escrow, as a loan to Ferromet, to cover the dispute with the owners of the *Grigoroussa,* and POSCO agreed to waive the discrepancies in the documentation required by the Shinhan letter of credit.[2] Thus, on February 20, 1992, INB, acting as Ferromet's collecting bank, was able to draw down the letter of credit, including amounts that Ferromet had billed as "[sub]freight" charges; INB immediately credited the proceeds to the outstanding principal of its loan to Ferromet. INB then withdrew from further negotiations regarding the freight installments that Ferromet had failed to pay to Cornish.

Cornish reacted to these events the next day by obtaining an *ex parte* order from a Panamanian court authorizing arrest of the cargo aboard the *Filoktitis*. The ship was then detained in Panama for an additional two and one-half months while Cornish and POSCO tried to work out a compromise. During this interval, an involuntary bankruptcy petition was filed against Ferromet. Finally, on May 11, 1992, Cornish and POSCO entered into an agreement settling their disputes relating to the voyage. Pursuant to this settlement, POSCO agreed to pay Cornish $650,000 and to share other expenses,

and Cornish agreed to transport the cargo of the *Filoktitis* to Korea. The cargo was finally delivered to POSCO on June 30.

*District Court proceedings.* In the District Court, Cornish argued that approximately $1.6 million of the proceeds that INB had collected from the Shinhan letter of credit represented subfreights subject to Cornish's maritime lien on subfreights, and that INB violated the Court's Rule C arrest warrants when it credited those funds to its own account. POSCO, with Cornish's consent, intervened as plaintiff on a subrogation theory, claiming a stake in any recovery from INB to the extent of the payments POSCO had made to Cornish under their May 11 settlement agreement. In response to the plaintiffs, INB argued that once the proceeds of the letter of credit were transferred to it in its capacity as collecting agent for Ferromet, those proceeds ceased to be subfreights to which Cornish's lien attached. On cross-motions for summary judgment, the District Court upheld INB's legal theory and, finding that no material facts were in dispute, entered summary judgment dismissing Cornish's and POSCO's claims against INB. *See Cornish Shipping Ltd. v. Ferromet Resources, Inc.,* 1995 A.M.C. 235, 1994 WL 171717 (S.D.N.Y.1994) (mem. op. and order). Pursuant to Fed.R.Civ.P. 54(b), the District Court ordered entry of a final judgment on these claims.[3]

## Discussion

■ The primary issue on this appeal is whether a shipowner's lien on subfreights attaches to funds that a consignee remits to a charterer after the consignee has received notice that the shipowner is exercising its lien. Although this precise issue has not

---

**2.** The parties dispute whether INB also represented to POSCO that it would use the proceeds from the letter of credit to resolve Cornish's claim for the freight payments defaulted on by Ferromet. Under our holding in this case, this factual dispute is not material to whether Cornish's lien attaches to the funds that were paid to INB.

**3.** A claim by Cornish against Ferromet for breach of the charter party remains before the District Court pending its resolution in Ferromet's bankruptcy proceedings in Texas. POSCO

has also filed a proof of claim against Ferromet in the bankruptcy court, including a claim for freight costs it paid under the May 11 settlement agreement with Cornish. In addition, POSCO had previously initiated a suit against INB and Ferromet in New York Supreme Court, alleging a cause of action, among others, for common law fraud in connection with the February 20 agreement with INB, in which POSCO waived the discrepancies in the documentation required to draw down the Shinhan letter of credit.

previously been resolved, prior cases and important policy considerations favor the view that a shipowner's lien on subfreights represents a contingent right to collect a debt directly from a consignee, rather than a right to specific funds that the consignee intends to use or has used to satisfy that debt. In accordance with this view, we conclude that the shipowner's lien does not give it a right to trace specific funds that the consignee has paid to a charterer.

■ Most aspects of the law governing a shipowner's maritime lien on subfreights are well established. To secure payments of freight due from a charterer of its ship, a shipowner may create, by express provision in the charter party, a lien on the subfreights earned by the vessel. *Marine Traders, Inc. v. Seasons Navigation Corp.*, 422 F.2d 804, 806 (2d Cir.1970). Subfreights are amounts that third-party payors—whether subcharterers, shippers, or consignees (generically: "consignees")—contract to pay to the charterer for the use of the ship or the transport of goods.[4] If the charterer defaults on its payment of freight or its other obligations under the charter party, the shipowner may exercise its lien on the subfreights by giving notice to the consignee. Before such notice is given, however, the lien is essentially inchoate. Indeed, the lien is altogether extinguished if the consignee pays the subfreights to the charterer or its agent in good faith prior to receiving notice of the lien. *See Tarstar Shipping Co. v. Century Shipline, Ltd.*, 597 F.2d 837, 839–40 (2d Cir. 1979); *Union Industrielle et Maritime v. Nimpex International, Inc.*, 459 F.2d 926, 929 (7th Cir.1972); *Beverly Hills National Bank & Trust Co. v. Compania de Navegacione Almirante S.A.*, 437 F.2d 301, 304 (9th Cir.), *cert. denied*, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971); *Marine Traders*, 422 F.2d at 806; *Hall Corp. of Canada v. Cargo ex Steamer Mont Louis*, 62 F.2d 603,

605 (2d Cir.1933); *MCT Shipping Corp. v. Sabet*, 497 F.Supp. 1078, 1084–85 (S.D.N.Y. 1980); *In re North Atlantic & Gulf Steamship Co.*, 204 F.Supp. 899, 904 (S.D.N.Y. 1962), *aff'd sub nom. Schilling v. A/S D/S Dannebrog*, 320 F.2d 628 (2d Cir.1963).

■ Cornish satisfied the established requirements for asserting its lien on the subfreights of the *Filoktitis*. The lien was created under the terms of the charter party and incorporated into the bill of lading, and Cornish (the shipowner) gave notice to POSCO (the consignee) that it was exercising its lien before POSCO took the final steps necessary to authorize payment of "freight" charges to INB, the agent of Ferromet (the charterer). Thus, the established rule that the lien is extinguished if the consignee makes payment to the charterer *prior to* receiving notice of the lien does not resolve the issue in this case. When a consignee pays ostensible "subfreights" to the charterer *after* receiving notice of the lien, as occurred here, such payment does not discharge the *consignee's* liability for the subfreights to the owner. *See Tarstar*, 597 F.2d at 839–40; *North Atlantic & Gulf*, 204 F.Supp. at 904. Thus, precisely because Cornish asserted its lien by giving notice to POSCO before POSCO paid subfreights to Ferromet, Cornish has a cause of action *against POSCO* that would not otherwise be available to it.

Cornish and POSCO join, however, in seeking an additional remedy *against INB*. They argue that if a shipowner gives timely notice of its lien prior to payment of the subfreights by the consignee, the lien attaches to the subfreight funds as a *res*, and the lien then follows those funds into the hands of any recipient who has notice of the lien, including the charterer or its agent.[5] According to this view, Cornish's primary remedy is against INB, because INB re-

---

**4.** For the owner's lien on subfreights to be effective against shippers or consignees, we have stated that the terms of the charter party must also be restated in or incorporated by reference into the bill of lading. *See Oceanic Trading Corp. v. Freights of the Vessel Diana*, 423 F.2d 1, 5 (2d Cir.1970).

**5.** It is not entirely clear that Cornish is making a traditional lienor's argument that the lien attached to the funds as they moved from POSCO to INB. At oral argument, counsel suggested that the funds might not have been subject to a lien as they moved to INB, but that, in some metaphysical sense, they encountered the barrier of the lien plus the Rule C arrest warrant just prior to coming into INB's possession.

ceived the subfreight funds after the lien had attached and after INB itself had received notice of the lien via service of Cornish's Rule C arrest warrant.[6] In response, INB argues that the owner's lien on subfreights confers no right to follow the subfreight funds after they have been paid to the charterer or its agent, because payment destroys the funds' character as an independent *res* to which the lien can attach. In spite of each side's vigorous insistence that its theory has been clearly established by prior cases, we have found no authority that directly confronts the issue of whether the additional remedy claimed by Cornish and POSCO is available when subfreights are paid after the consignee has received notice.[7] To resolve this dispute, it is necessary to take a broader view of the conceptual underpinnings and policy implications of the parties' rival theories.

On the surface, Cornish's and POSCO's position has substantial plausibility. In American admiralty law, "the existence of a maritime lien is synonymous with the availability of a libel *in rem*." Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 622 (2d ed. 1975); *see also* 7A James W. Moore et al., *Moore's Federal Practice* ¶ C.02, at 609 (2d ed. 1993); Supp.R.Adm. & Mar.Claims C(1)(a) (action *in rem* may be brought to enforce any maritime lien). It is not unreasonable to assume that in the case of the owner's lien on subfreights, the pertinent *res* is the specific funds that the consignee pays or intends to pay to the charterer for transport. *See* 7A Moore et al., *supra*, ¶ C.13, at 683 ("freights—which are *moneys paid* for the transportation of cargo ...— may be liened" (emphasis added)). Moreover, we have stated, in an older case involving a different type of lien on freights, that once a lien attaches to such funds, the lien

follows the proceeds through all of their traceable transmutations:

> The lien created by a maritime pledge of freights follows the freights through all their transmutations, and wherever they can be found. It is familiar doctrine of the admiralty courts that a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it, and that the lienholder may follow the proceeds wherever he can distinctly trace them. "Wherever there is a maritime lien upon property, it adheres to the proceeds of that property, into whose hands soever they may go, and these proceeds may be attached in the admiralty."

*Bank of British North America v. Freights of the Hutton*, 137 F. 534, 536 (2d Cir.1905) (quoting Benedict, *Admiralty Practice* § 290 (3d ed.)); *see also In re Bauer Steamship Corp.*, 167 F.Supp. 909, 911 (S.D.N.Y.1957). Once timely notice has been given, permitting the lienor to follow the subfreight funds into the hands of the charterer also has the apparent practical advantage that the lienor cannot be deprived of his lien merely because the consignee erroneously pays the funds to the charterer. Moreover, if the lien does attach to these funds, its maritime character would give the shipowner priority over rival claimants with land-based security interests, even interests created earlier in time. *See In re Topgallant Lines, Inc.*, 154 B.R. 368, 376 (S.D.Ga.1993), *aff'd sub nom. McAllister Towing v. Ambassador*, 20 F.3d 1175 (11th Cir.1994); *Taiwan International Line Ltd. v. Matthew Ship Chartering Ltd.*, 546 F.Supp. 826, 829 (S.D.N.Y.1982); Gilmore & Black, *supra*, at 734.

Nevertheless, we believe that the *res* to which the owner's lien on subfreights at-

---

6. In the event that the recipient subsequently commingles the liened fund with other monies, Cornish and Posco also contend that the shipowner can proceed against the recipient *in personam* for violation of the lien.

7. The District Court relied on Judge Sand's opinion in *MCT Shipping, supra*, as authority for the proposition that payment of subfreights to the charterer or its agent extinguishes the shipowner's lien, even if such payment occurs after the shipowner notifies the payor that it is exercising

the lien. However, a careful review of the facts reported in *MCT Shipping* indicates that in that case the shipper probably paid the subfreights to the charterer *before* the owner notified the shipper of its lien. Among other indications, the court and parties in *MCT Shipping* appeared to agree that the payment discharged the *shipper's* liability to the owner as well as the charterer, *see* 497 F.Supp. at 1085, which would not be true if the payment were made after the owner had given notice of its lien.

taches should not be conceived as specific funds, as plaintiffs' theory assumes, but rather as a debt. Linguistically, the term "subfreights" appears to be used to refer both to the consignee's debt for freight costs and to the actual monies used or intended to be used to pay that debt. It is important to distinguish between these two meanings in the present context. If the owner's lien attaches to subfreights as a debt, the exercise of that lien should vest the owner with the rights that the charterer would otherwise have under the contract of affreightment to proceed against that debt. The owner then becomes, in effect, the assignee or subrogee of the charterer's rights; as such, however, the owner does not accede to any additional rights beyond those that the charterer formerly had. On this theory, once the owner gives timely notice of its lien to the consignee, the consignee's obligation to pay the debt for subfreights runs exclusively to the owner, and any subsequent payment to the charterer does not extinguish that obligation. But because maritime law does not give the charterer an interest in any specific funds in the consignee's accounts,[8] the owner should not receive such an interest when it is subrogated to the rights of the charterer.

Several considerations favor the conclusion that the shipowner's lien attaches to the debt for subfreights, rather than to specific subfreight funds. First, in *United States v. Freights of S.S. Mount Shasta,* 274 U.S. 466, 470, 47 S.Ct. 666, 670–71, 71 L.Ed. 1156 (1927), the Supreme Court held that admiralty's *in rem* jurisdiction over subfreights does not require the existence of specific funds, but extends to a debt for subfreights, even a debt that is disputed and unliquidated. In reaching this result, the Court noted:

> By the general logic of the law a debt may be treated as a *res* as easily as a ship. It is true that it is not tangible, but it is *a right of the creditor's, capable of being attached* and appropriated by the law to the creditor's duties.

*Id.* (emphasis added). If, as *Mount Shasta* implies, the *res* that is "capable of being attached" is "a right of the creditor's," *i.e.,* of the charterer, then exercise of that power of attachment should work an assignment of that intangible right to the shipowner. In accordance with this view, several cases have expressly characterized a shipowner with a valid lien on subfreights as standing "in the eyes of the admiralty ... with all the rights of an assignee under a deed of assignment," *American Steel Barge Co. v. Chesapeake & Ohio Coal Agency Co.,* 115 F. 669, 673 (1st Cir.1902), so that "[a]t the proper time, and under the proper circumstances, a libelant holding a lien on subfreight becomes subrogated to all the remedies of the charterer," *id.* at 674; *accord Luckenbach Overseas Corp. v. Subfreights of the S.S. Audrey J. Luckenbach,* 232 F.Supp. 572, 575, 577 (S.D.N.Y.1963); *Larsen v. 150 Bales of Sisal Grass,* 147 F. 783, 785 (S.D.Ala.1906); *see also MCT Shipping,* 497 F.Supp. at 1085 ("Once the freight is paid, the owner, *insofar as he stands in the charterer's shoes,* is entitled to nothing." (emphasis added)). The shipowner's lien has also been said to be "derivative" of the charterer's remedies against the consignee. 2 Schoenbaum, *supra,* at 207; *see also North Atlantic & Gulf Steamship,* 204 F.Supp. at 904; *Bauer Steamship Corp.,* 167 F.Supp. at 910. Since the charterer's rights do not include a lien on specific subfreight funds in the consignee's account, the shipowner's attachment of those rights should not carry with it a lien on any specific funds.

The conclusion that the shipowner's lien on subfreights attaches to the charterer's legal rights to collect a debt for subfreights from the consignee, rather than to any specific funds that the consignee has designated for payment of that debt, receives support from the traditional rule that the lien is extinguished if the consignee pays the charterer in good faith before receiving notice of the lien. If it were true that the lien gave the owner an interest in the subfreights as funds, it would be logical for the owner to be able to execute the lien against those funds, or any identifiable portion of them, even if the consignee had paid them to the charterer before receiving notice of the lien. Under those circumstances, payment prior to notice should, at most, discharge the consignee's

---

8. The charterer has a possessory lien on cargo to secure the consignee's payment of subfreights, *see North Atlantic & Gulf,* 204 F.Supp. at 904; 2

Schoenbaum, *supra,* at 207, but not a lien on any funds in the consignee's accounts.

personal liability, rather than extinguish the owner's lien altogether. On the other hand, if the lien attaches to the subfreight only as a debt, it is easy to see why payment prior to notice completely extinguishes the lien: in that case, there is no longer any debt to attach. *Cf. Tarstar*, 597 F.2d at 840 (where subfreights are paid to agent of charterer prior to notice, they "los[e] their character as an independent *res* to which the owner's lien could attach").

Thus, to the extent that plaintiffs' argument depends on the theory that Cornish's lien attached directly to the funds that POSCO had designated as subfreights and then followed those funds into INB's accounts, their argument fails. However, the funds that POSCO remitted to INB might still be conceived as the *proceeds* of the debt to which Cornish's lien attached. Under the above-quoted language of *The Hutton*, 137 F. at 536, "a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it, and ... the lienholder may follow the proceeds wherever he can distinctly trace them."[9] In our view, however, this fund does not represent "proceeds" of the debt that Cornish is entitled to follow. Once POSCO received notice of the lien, and thus of the "assignment" to Cornish of Ferromet's rights as subfreight creditor, POSCO could extinguish the debt only through payment to Cornish or its agents, not to Ferromet or its agents. Since POSCO's remittance to INB did not represent payment of the attached debt for subfreights,

the monies remitted were not the debt's proceeds, and they therefore may not be traced by Cornish. Of course, the logical corollary is that neither the debt for subfreights—the *res* to which the lien attached—nor the lien itself could be extinguished by POSCO's transfer of the funds to INB. *See North Atlantic & Gulf*, 204 F.Supp. at 904 (timely notice of lien "bars the shipper from discharging his liability for the subfreights by payment to the charterer"). That transfer was, at bottom, irrelevant to Cornish's right to execute the lien by proceeding against POSCO for payment of the debt. *See Tarstar*, 597 F.2d at 839–40 (payment to charterer after notice of lien does not extinguish owner's right to proceed against subcharterer).

A comparison with the provisions of the Uniform Commercial Code governing security interests in accounts receivable helps to illuminate the limitations of the shipowner's lien on subfreights.[10] Like the shipowner's lien, a U.C.C. security interest in accounts receivable gives the secured party a priority interest in debts that an account debtor owes to the secured party's primary debtor. Article 9 of the U.C.C. gives the secured party two distinct remedies for enforcing this security interest, only one of which is available to the holder of a maritime lien on subfreights. First, upon default by the primary debtor, the secured party is entitled to notify account debtors that they are to make payments directly to it, rather than to the primary debtor. *See* U.C.C. § 9–502(1); *Community*

---

**9.** Although *The Hutton* also concerned a lien on freights, it was significantly different from the lien at issue here: in order to secure advances from his bank, the charterer in *The Hutton* had granted the bank a lien on the freights that he collected from specific voyages financed by the bank. *See* 137 F. at 535–36. Because by its terms the bank's lien attached directly to the funds after they were paid to the charterer, rather than to the charterer's chose in action against the payor, *The Hutton* did not present the question whether the funds received by the charterer represented the proceeds of a debt that had been assigned to another party. In addition, in *The Hutton* the funds that the lienholder succeeded in tracing back to the subfreights were still in the charterer's own accounts. Thus, *The Hutton* was *not* a case in which the proceeds of attached property had to be traced into the hands of a third party, and its sweeping language concerning the lienholder's right to trace such proceeds

went far beyond its facts. We note that despite their putative "indelibility," maritime liens are often defeated by a defense of laches if the attached property or its proceeds has passed into the hands of a purchaser without notice of the lien. *See* Gilmore & Black, *supra*, at 764–65.

**10.** Maritime liens and land-based liens, such as article 9 security interests, have been characterized as "two unlike things ... called by the same name." Gilmore & Black, *supra*, at 589; *see also In re Pacific Caribbean Shipping (U.S.A.), Inc.*, 789 F.2d 1406, 1407 (9th Cir.1986). It would therefore be inapt to construe the scope of maritime lines on analogy with land liens. Nonetheless, because subfreights are akin to accounts receivable, *see Topgallant Lines*, 154 B.R. at 374, article 9's treatment of security interests in accounts may provide useful tools for analyzing subfreight liens.

*Bank v. Newmark & Lewis, Inc.*, 534 F.Supp. 456, 460 (E.D.N.Y.1982). In effect, notice to the account debtor under section 9–502(1) subrogates the secured party to the rights of the primary debtor—the remedy that is available to enforce a shipowner's lien. In addition, however, a party with a security interest in accounts receivable also has a continuously perfected interest in the identifiable cash proceeds of those accounts, *i.e.*, in the payments remitted by the account debtor to the primary debtor. *See* U.C.C. §§ 9–306(3)(b), (4), –502(1). But this interest in proceeds is entirely independent of the secured party's right of subrogation. Even if the secured party has not instructed an account debtor to pay him directly, under section 9–306 his security interest ordinarily attaches to proceeds of the debt that are paid to the primary debtor. A shipowner, in contrast, has no analogous interest in subfreight payments that are made to a charterer before the owner gives notice that it is exercising its lien. The shipowner's lien gives it the right to seek payment of subfreights from the consignee or other payor, but not the analytically distinct right to take control of payments that the consignee makes to the charterer or its agent.

This narrow construction of the shipowner's lien on subfreights also adheres to longstanding judicial policy:

> Because the maritime lien is a secret lien arising by operation of law, "[i]t may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore *stricti juris* and will not be extended by construction, analogy or inference."

*Itel Containers International Corp. v. Atlanttrafik Express Service Ltd.*, 982 F.2d 765, 768 (2d Cir.1992) (quoting *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 12, 41 S.Ct. 1, 4, 65 L.Ed. 97 (1920)). The facts of this case well attest to the importance of this policy. INB possessed security interests in Ferromet's current and after-acquired receivables long before Cornish and Ferromet entered into the charter party that created Cornish's lien on the subfreights. Although INB had notice of Cornish's lien in February 1992, when it received the proceeds of the Shinhan letter of credit, the priority accorded a maritime lien would still work to the prejudice of

rights the bank had acquired years before it had such notice. The fate of the *Filoktitis* in Panama also illustrates how the multiplication of these secret liens can "hamper[ ] instead of advance[ ] ease and freedom of commerce," *The Saturnus*, 250 F. 407, 414 (2d Cir.), *cert. denied*, 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918).

The countervailing policy arguments advanced by Cornish and POSCO are less persuasive. They maintain that limitations on a shipowner's means for enforcing its lien will harm maritime commerce by undermining one of the few devices available to secure the payment of freight. But a shipowner's remedies are not unduly restricted by our holding. In addition to an *in personam* claim against the charterer for freights due under the charter party, a shipowner who has given timely notice of its lien obtains the right to proceed directly against the consignee for subfreights due. Once it has attached, this latter right cannot be defeated by the consignee's erroneous payment to the charterer, because that payment is irrelevant to the consignee's liability to the owner. Although the additional remedy of being able to attach funds that were erroneously paid to the charterer would be of great value to Cornish under the facts of this case, the prospective value of this additional remedy to shipowners in general is so uncertain that its presence is unlikely to affect their willingness to enter into charters. This is especially so because the security offered by the lien on subfreights is by its nature tenuous, subject to complete defeasance by payment to the charterer prior to notice.

We are also not persuaded by Cornish's and POSCO's contention that the rule we adopt will encourage charterers and their agents to deal in bad faith, as plaintiffs suggest INB did when it negotiated with POSCO for the waiver necessary to draw down the Shinhan letter of credit. Insofar as Cornish is concerned, INB's conduct simply had no effect on Cornish's rights to enforce its lien against POSCO. As for POSCO, sufficient state law remedies are available if, as plaintiffs intimate, INB in fact fraudulently induced it to waive the discrepancies or breached a contract to forward a portion of the proceeds to Cornish in satisfaction of the latter's lien. Expanding the scope of the

shipowner's lien is not necessary to prevent fraud. In the event that a consignee is in doubt about which party has the right to receive payment for freight costs, it can deposit an appropriate sum in escrow pending judicial resolution of the question. *See Taiwan International Line*, 546 F.Supp. at 829.[11]

### Conclusion

The judgment of the District Court, granting INB's motion for summary judgment, is affirmed.

11. Our resolution of the main issue on this appeal renders moot plaintiffs' argument that prior service on INB of a Rule C arrest warrant for the subfreights prevented, as a matter of law, INB from validly receiving the subfreight fund, and that therefore the transfer of funds from POSCO could not have extinguished Cornish's lien because it did not constitute legal payment of the subfreights to the charterer or its agent. Under our holding above, Cornish's lien did not attach to the specific funds transferred by POSCO to INB; at the same time, this transfer was ineffective to extinguish Cornish's lien on POSCO's debt for subfreights. We note, in addition, that plaintiffs' argument incorrectly assumes that a Rule C arrest warrant is effective against property that comes into the possession of a garnishee after service of the warrant. *See Reibor International Ltd. v. Cargo Carriers (KACZ–CO.) Ltd.*, 759 F.2d 262 (2d Cir.1985) (holding that Rule B attachment does not extend to after-acquired property); *see also Union Planters National Bank v. World Energy Systems Associates*, 816 F.2d 1092, 1098 (6th Cir.1987). Although *Reibor* concerned an order of attachment under Rule B of the Supplemental Rules, the policy considerations that motivated the Court in *Reibor* apply with equal force to Rule C arrests. *Cf. United States v. All Monies of Banco Cafetero International*, 608 F.Supp. 1394, 1403–04 (S.D.N.Y.1985) (applying *Reibor* rule to Rule C arrest in forfeiture action), *aff'd*, 797 F.2d 1154 (2d Cir.1986).